BRYANT, Judge.
 

 *122
 
 Where the Disciplinary Hearing Commission's conclusions that Christopher W. Livingston violated the Rules of Professional Conduct are supported by the findings of fact which are in turn supported by the evidence, and where Livingston's conduct caused significant harm or potentially significant harm to the public, the profession, or the administration of justice, we affirm the order disciplining
 
 *186
 
 Livingston and imposing a five year suspension of a law license with an opportunity to petition for a stay after two years.
 

 In March 2008, defendant Christopher W. Livingston, an attorney, entered into an agreement with a business known as Credit Collections Defense Network ("CCDN") to serve as an "Associate Attorney." In that position, Livingston agreed to accept referrals of debt-laden consumers from CCDN, which is not a law firm, whereby CCDN would collect fees from customers and convey a portion to Livingston for his legal services to those customers. Per the agreement, Livingston was responsible for "legal advice, litigation, filing of pleadings, discovery responses (if necessary), and ... cover[ing] court appearances (if necessary)" for CCDN's customers.
 

 Around 20 April 2008, Livingston concluded that CCDN was engaged in the unauthorized practice of law by preparing court documents for CCDN's customers to file
 
 pro se
 
 . Livingston so advised CCDN through its representative, Colleen Lock, but did not terminate his relationship with CCDN. As such, CCDN continued to represent to North Carolina residents that CCDN was affiliated with licensed North Carolina lawyers, namely Livingston.
 

 *123
 
 In September 2008, Livingston filed three lawsuits against CCDN (respectively, "Lawsuits 1, 2, and 3") in Bladen County District Court on behalf of three CCDN customers-William Harrison, Sheryl Lucas, and Cathy Hunt-alleging fraud, unfair and deceptive trade practices, gross and willful legal malpractice, and violations of both the North Carolina and federal Racketeer Influenced and Corrupt Organizations Acts ("RICO"). Livingston named a number of individuals and out-of-state business entities, including Robert Lock, Philip Manger, and R.K. Lock & Associates d/b/a "CCDN," but did not name the legal entity "CCDN, LLC" as a defendant. After making appearances to challenge personal jurisdiction over the named defendants, counsel for CCDN informed Livingston that CCDN was a limited liability company organized in Nevada. Livingston confirmed that fact but did not amend the complaints he had filed.
 

 On 7 January 2009, while Lawsuits 1, 2, and 3 were still pending, Livingston filed another lawsuit ("Lawsuit 4") in Bladen County Superior Court against many of the same individual named defendants. Lawsuit 4 also named CCDN, LLC as a defendant. Livingston framed Lawsuit 4 as a class action and named an individual plaintiff, Sharon Southwood, as the class representative.
 
 [1]
 
 In a motion to certify the class, Livingston stated that he would not provide notice to class members as required by law. No class was ever certified.
 

 In May 2009, the trial court dismissed Lawsuits 1, 2, and 3 for failure to name a necessary party-CCDN, LLC-and for lack of personal jurisdiction over the remaining defendants. The trial court concluded that none of the individual defendants had sufficient minimum contacts for personal jurisdiction before a North Carolina court.
 
 See
 

 Lucas v. R.K. Lock & Assocs.
 
 , Nos. COA10-874, COA10-875, COA10-891,
 
 2011 WL 721289
 
 , at **5-6 (N.C. Ct. App. Mar. 1, 2011) (unpublished),
 
 rev. denied
 
 ,
 
 365 N.C. 347
 
 ,
 
 719 S.E.2d 17
 
 (2011).
 
 [2]
 

 *124
 
 On 11 November 2009, Livingston commenced a RICO class action against CCDN and other named defendants in U.S. District Court for the Eastern District of North Carolina ("Lawsuit 5"). On or about 17 November 2009, Livingston contacted a South Carolina attorney, Andrew Arnold, who was representing CCDN in South Carolina litigation. Livingston left Arnold a voicemail message
 
 *187
 
 stating that he represented a "national class" in his suit, that Arnold had participated in a money laundering scheme by accepting legal fees from CCDN, and demanded that Arnold forfeit to Livingston all fees he had received from CCDN. Livingston also threatened to join Arnold in Lawsuit 5.
 

 A week later, Livingston filed an amended complaint in Lawsuit 5, adding Arnold, Arnold's firm, the North Carolina lawyer who represented CCDN in Lawsuits 1-4 (Lee Bettis), Bettis's firm, and individual members of Bettis's firm who had not participated in representing CCDN. Livingston accused the lawyers and their firms of having knowledge of their clients' fraudulent conduct and participating in the fraud by accepting legal fees and representing CCDN clients. The federal court later dismissed the aforementioned lawyers and their firms from Lawsuit 5 as Livingston had no basis in law or fact to sue them.
 
 See
 

 Taylor v. Bettis
 
 ,
 
 976 F.Supp.2d 721
 
 , 733-34, 736-39, 741-42, 745-47, 752-54 (E.D.N.C. 2013) (denying defendants' motion to dismiss but finding for defendants on their motion for judgment on the pleadings and dismissing plaintiffs' claims).
 

 While Lawsuit 5 was still pending, on 7 January 2011, Livingston filed Lawsuit 6 in Columbus County Superior Court against the North Carolina attorneys on substantially the same underlying facts as alleged in Lawsuit 5. By email, Livingston informed Philip Collins, opposing counsel for the North Carolina attorneys in Lawsuit 6, that he planned to file suits against them each month for the remainder of the year. On 22 February 2011, the Columbus County Superior Court dismissed Lawsuit 6, which dismissal was affirmed by this Court.
 
 Cullen v. Emanuel & Dunn, PLLC
 
 , No. COA11-921,
 
 2012 WL 3573696
 
 , at *3, *11 (N.C. Ct. App. Aug. 21, 2012) (unpublished).
 

 On 10 April 2015, the North Carolina State Bar filed a complaint with the Disciplinary Hearing Commission (the "DHC") against Livingston alleging attorney misconduct in violation of the North Carolina Rules of Professional Conduct ("RPC"). Livingston filed his answer on 4 May 2015.
 

 A hearing was held before the DHC from 17 to 20 May 2016. On 14 July 2016, the DHC entered its Order of Discipline suspending
 
 *125
 
 Livingston's law license for five years with the possibility of a stay after two years. On 5 August 2016, Livingston filed notice of appeal from the Order of Discipline and other orders entered against him.
 
 [3]
 

 _________________________
 

 On appeal, Livingston argues the DHC (I) violated his due process and equal protection rights; (II) erroneously found RPC violations; and (III) ordered excessive discipline.
 

 I
 

 Livingston first argues the DHC violated his due process and equal protection rights, arguing that he received "no meaningful evidentiary hearing." Specifically, Livingston argues the DHC took an insufficient amount of time to consider the evidence presented, the State Bar engaged in prosecutorial misconduct, and the findings of fact in the DHC's order are vague. We disagree.
 

 "The standard of review for alleged violations of constitutional rights is
 
 de novo
 
 ."
 
 State v. Graham
 
 ,
 
 200 N.C. App. 204
 
 , 214,
 
 683 S.E.2d 437
 
 , 444 (2009) (citation omitted). However, "a constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal."
 
 State v. Hunter
 
 ,
 
 305 N.C. 106
 
 , 112,
 
 286 S.E.2d 535
 
 , 539 (1982) (citations omitted).
 

 To the extent Livingston makes a constitutional challenge for the first time on appeal,
 
 *188
 
 he contends he received "no meaningful evidentiary hearing, violating his Fourteenth Amendment due process and equal protection and N.C. Const. Art. I § 19 Law-of-the-Land rights[.]" We briefly address this argument.
 

 Based on our thorough review of the record in this case, we are satisfied that "the DHC conducted a fair and unbiased process that fully comported with the principles of due process."
 
 See
 

 N.C. State Bar v. Sutton
 
 , --- N.C. App. ----, ----,
 
 791 S.E.2d 881
 
 , 891 (2016),
 
 appeal dismissed
 
 ,
 
 369 N.C. 534
 
 ,
 
 797 S.E.2d 296
 
 (2017). Due process was satisfied
 
 *126
 
 where Livingston was given notice of the allegations against him, he filed an answer to the DHC's complaint, served discovery on the DHC, took depositions, attended the trial, examined witnesses, and made arguments before the DHC, availing himself of a full and fair opportunity to participate.
 
 See
 

 N.C. State Bar v. Braswell
 
 ,
 
 67 N.C. App. 456
 
 , 458,
 
 313 S.E.2d 272
 
 , 274 (1984) ("The filing of a formal complaint satisfies [a] defendant's right to be informed of and respond to the charges against him."). Contrary to Livingston's argument, due process does not require the DHC to deliberate for any prescribed length of time. Livingston also alleges the State Bar engaged in prosecutorial misconduct by failing to correct false testimony given by Bettis. But Livingston is unable to show that Bettis's testimony was false, and is therefore unable to sustain a claim of prosecutorial misconduct based on "failure to correct false testimony." Finally, as set forth in Section II,
 
 infra
 
 , the findings of fact in the Order of Discipline are not vague. Indeed, the DHC "ruled on numerous motions filed by [Livingston] and issued orders containing detailed findings of fact and conclusions of law. Therefore, the record belies [Livingston's] assertion that he was denied due process in connection with his disciplinary proceeding."
 
 Sutton
 
 , --- N.C. App. at ----,
 
 791 S.E.2d at 891
 
 . Accordingly, Livingston's argument that the DHC violated his due process and equal protection rights, as well as his N.C. Constitutional rights, is overruled.
 

 II
 

 Livingston next argues the DHC erroneously found that he violated the Rules of Professional Conduct because the findings of fact are not supported by the evidence. We disagree.
 

 Appeals from orders of the DHC "are conducted under the 'whole record test,' which requires the reviewing court to determine if the DHC's findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law[.]"
 
 N.C. State Bar v. Talford
 
 ,
 
 356 N.C. 626
 
 , 632,
 
 576 S.E.2d 305
 
 , 309 (2003) (internal citations omitted).
 

 Such supporting evidence is substantial if a reasonable person might accept it as adequate backing for a conclusion. The whole-record test also mandates that the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn. Moreover, in order to satisfy the evidentiary requirements of the whole-record test in an attorney disciplinary action, the evidence used by the DHC to
 
 *127
 
 support its findings and conclusions must rise to the standard of "clear[, cogent,] and convincing."
 

 Id.
 
 at 632,
 
 576 S.E.2d at 309-10
 
 (alteration in original) (internal citations omitted) (quoting
 
 In re Suspension of Palmer
 
 ,
 
 296 N.C. 638
 
 , 648,
 
 252 S.E.2d 784
 
 , 790 (1979) ). "Ultimately, the reviewing court must apply all the aforementioned factors in order to determine whether the decision in the lower body, e.g., the DHC, 'has a rational basis in the evidence.' "
 
 Id.
 
 at 632-33,
 
 576 S.E.2d at 310
 
 (citation omitted) (quoting
 
 In re Rogers
 
 ,
 
 297 N.C. 48
 
 , 65,
 
 253 S.E.2d 912
 
 , 922 (1979) ).
 

 [U]nder the whole record test, ... the following steps are necessary as a means to decide if a lower body's decision has a "rational basis in the evidence": (1) Is there adequate evidence to support the order's expressed finding(s) of fact? (2) Do the order's expressed finding(s) of fact adequately support the order's subsequent conclusion(s) of law? and (3) Do the expressed findings and/or conclusions adequately support the lower body's ultimate decision? ... [I]n cases such as ... those involving an "adjudicatory phase" (Did the
 
 *189
 
 defendant commit the offense or misconduct?), and a "dispositional phase" (What is the appropriate sanction for committing the offense or misconduct?), the whole-record test must be applied separately to each of the two phases.
 

 Id.
 
 at 634,
 
 576 S.E.2d at 311
 
 .
 

 A.
 
 Conclusions 2(a) and 2(b)
 

 Livingston challenges Conclusions 2(a) and 2(b) as unsupported by the findings of fact, specifically Findings of Fact Nos. 4-12, as he contends those findings are not supported by competent evidence. Conclusions 2(a) and 2(b) state as follows:
 

 (a) By entering into a contractual agreement with CCDN which contemplated the sharing of legal fees with a nonlawyer in violation of Rule 5.4(a), Livingston attempted to violate the Rules of Professional Conduct in violation of Rule 8.4(a);
 

 (b) By affiliating with CCDN and providing legal services to customers of CCDN, which was engaged in the unauthorized practice of law in North Carolina, Livingston assisted another in the unauthorized practice of law in violation of Rule 5.5(d)[.]
 

 *128
 
 Findings of Fact Nos. 4-12 are as follows:
 

 4. In March 2008, Livingston entered into a contractual agreement with Credit Collections Defense Network, LLC ("CCDN"), whereby CCDN would refer debtors seeking debt-relief assistance to Livingston for legal representation (this contract hereinafter referred to as "the Associate Attorney Agreement").
 

 5. CCDN was not a law firm, and was not authorized to engage in the practice of law in North Carolina.
 

 6. The Associate Attorney Agreement provided that CCDN would collect fees from customers and then remit a portion of those fees to Livingston for legal services Livingston rendered to those customers.
 

 7. The Associate Attorney Agreement provided that CCDN would "prepare drafts of all [court] filings for review and approval" by Livingston.
 

 8. The Associate Attorney Agreement prohibited Livingston from "directly or indirectly attempting in any manner to persuade any client of CCDN to cease to do business with or to reduce the amount of business which any such client has customarily done or actively contemplates doing with CCDN."
 

 9. On or about 20 April 2008, Livingston determined that CCDN and/or its marketing partners had prepared legal documents for CCDN customers to file pro se or to be used to otherwise guide pro se litigation and thus had engaged in the unauthorized practice of law.
 

 10. On or about 20 April 2008, Livingston advised a CCDN representative, Colleen Lock, that, in preparing pleadings to be filed pro se, CCDN was engaged in the unauthorized practice of law.
 

 11. Despite becoming aware, at least as early as April 2008, that CCDN was engaged in the unauthorized practice of law, Livingston accepted additional clients from CCDN rather than immediately terminate his contractual relationship with CCDN.
 

 12. Livingston aided CCDN's unauthorized practice of law in North Carolina by maintaining his affiliation with CCDN.
 

 *129
 
 This allowed CCDN to continue to represent to North Carolina residents that it was affiliated with licensed lawyers in the state.
 

 1.
 
 Conclusion 2(a)-Sharing of Legal Fees
 

 Livingston contends that because he at most agreed to share fees, and binding precedent holds that "agreement" falls short of "attempt," Findings of Fact 4-12 are "legally erroneous," and the DHC's conclusions that he violated Rule 5.4(a) (sharing legal fees with a nonlawyer) and attempted to violate Rule 8.4(a) (violating/attempting to violate the RPC or knowingly assist another to do so) should be vacated.
 

 Rule 5.4(a) states that "[a] lawyer or law firm shall not share legal fees with a nonlawyer ...." N.C. Rev. R. Prof. Conduct, Rule 5.4(a) (2015). Although the Rules of Professional Conduct are not criminal statutes, Livingston's conduct in agreeing to share fees with CCDN met each of the required elements for criminal attempt: "(1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes
 
 *190
 
 beyond mere preparation, but (3) falls short of the completed offense."
 
 State v. Coble
 
 ,
 
 351 N.C. 448
 
 , 449,
 
 527 S.E.2d 45
 
 , 46 (2000) (citation omitted) (quoting
 
 State v. Miller
 
 ,
 
 344 N.C. 658
 
 , 667,
 
 477 S.E.2d 915
 
 , 921 (1996) ). Here, the findings of fact show that Livingston (1) intended to improperly share fees with CCDN, a nonlawyer entity, and entered into a contract for that purpose; (2) performed his services under the contract; and (3) expected to be paid, but was not. These findings, which support Conclusion 2(a), are also supported by the evidence.
 

 First, Livingston has offered no evidence that contradicts the findings other than his declaration that it was not his intent to share fees with a nonlawyer.
 
 [4]
 
 Second, Livingston testified he entered into the agreement, the agreement itself was entered into evidence at trial, and one of
 
 *130
 
 Livingston's own witnesses testified the only reason fee sharing never happened was because CCDN failed to make the payments. Accordingly, the findings of fact are supported by the evidence, which in turn support the DHC's conclusion that Livingston entered into an agreement which contemplated the sharing of legal fees with a nonlawyer entity in violation of Rule 5.4(a).
 

 2.
 
 Conclusion 2(b)-Assisting Another in the Unauthorized Practice of Law
 

 The version of Rule 5.5(d) in effect at the time of Livingston's conduct provided that "[a] lawyer shall not assist another person in the unauthorized practice of law." N.C. R. Prof. Cond., Rule 5.5(d) (2016).
 
 [5]
 
 The unauthorized practice of law in North Carolina is defined by statute,
 
 see
 

 N.C. Gen. Stat. § 84-2.1
 
 (2015), which prohibits the practice of law by corporations:
 

 It shall be unlawful for any corporation to practice law ... or hold itself out to the public or advertise as being entitled to practice law; and no corporation shall organize corporations, or draw agreements, or other legal documents, or draw wills, or practice law, or give legal advice, or hold itself out in any manner as being entitled to do any of the foregoing acts, by or through any person orally or by advertisement, letter or circular.
 

 N.C. Gen. Stat. § 84-5
 
 (a) (2015). Under North Carolina law, a business corporation may not provide legal services or the services of lawyers even if those services are performed by licensed North Carolina attorneys.
 
 See
 

 Gardner v. The N.C. State Bar
 
 ,
 
 316 N.C. 285
 
 , 294,
 
 341 S.E.2d 517
 
 , 523 (1986).
 

 Here, Livingston concedes that CCDN was engaged in the unauthorized practice of law. Livingston claims to have learned that CCDN was so engaged in April 2008, after CCDN customers referred to him told him what CCDN was doing. Livingston also concedes that he did not end his relationship with CCDN for another six weeks. Thus, even if Livingston did not become aware that CCDN was engaged in the unauthorized practice of law before April 2008, by his own concession, his failure to immediately terminate his relationship with CCDN when he did become aware of its unauthorized practice of law enabled CCDN to continue to promote having a North Carolina attorney (Livingston) available for its
 
 *131
 
 customers. Livingston's challenges to Conclusion 2(b) and the supporting findings of fact are unavailing and are overruled.
 

 B.
 
 Conclusion 2(c)
 

 Livingston challenges the DHC's Conclusion 2(c) as unsupported by the findings of fact, specifically Findings of Fact Nos. 13-29, as he contends those findings are not supported by competent evidence. Conclusion 2(c) states that "[b]y filing civil actions
 
 *191
 
 against defendants in a court that he knew lacked the ability to obtain jurisdiction over the defendants and by failing to join necessary defendants in those actions, Livingston engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d)[.]" Findings of Fact Nos. 13-29 are as follows:
 

 13. Later in 2008, after undertaking representation of several clients that CCDN referred to Livingston, Livingston concluded that CCDN practices were frivolous and fraudulent and began representing CCDN customers against CCDN.
 

 14. In September 2008, Livingston filed three complaints against CCDN on behalf of clients CCDN had referred to Livingston.
 

 15. Livingston filed these three complaints in Bladen County District Court (hereinafter collectively referred to as "the Bladen County actions").
 

 16. The Bladen County actions were captioned as follows: (i) Hunt v. R.K. Lock & Associates, an Illinois general partnership d/b/a Credit Collections Defense Network or CCDN; Robert K. Lock Esp.; Colleen Lock; Philip M. Manger Esq.; Tracy Webster; and Lawgistix, LLC, a Florida limited liability company, Defendants, Bladen County District Court file no. 08 CVD 883; (ii) Lucas v. R.K. Lock & Associates, an Illinois general partnership d/b/a Credit Collections Defense Network or CCDN; Robert K. Lock Esq.; Colleen Lock; Philip M. Manger Esq.; and Mark A. Cella, Bladen County District Court file no. 08 CVD 884, (iii) Harrison v. Aegis Corporation, a Missouri corporation; Debt Jurisprudence, Inc., a Missouri corporation; R.K. Lock & Associates, an Illinois general partnership d/b/a Credit Collections Defense Network or CCDN; Robert K. Lock Esq.; Colleen Lock; Philip M. Manger Esq.; David Kramer; Marcia M. Murphy; and Tracy Webster, Defendants, Bladen County District Court file no. 08 CVD 885.
 

 *132
 
 17. Livingston alleged on behalf of his clients in the Bladen County action that the defendants' actions constituted unfair and deceptive trade practices, fraud, breach of contract, gross and willful legal malpractice, violations of the "North Carolina Racketeer and Corrupt Organizations Act", violations of the "Credit Repair Organizations Act", and violations of the "Racketeer Influenced and Corrupt Organizations Act."
 

 18. Livingston further alleged that "CCDN sometimes refers to itself as 'CCDN LLC' but no limited liability company by that name can be found meaning that CCDN is a general partnership."
 

 19. None of the other defendants Livingston named in the Bladen County actions had personal minimum contacts with the State of North Carolina.
 

 20. Those defendants only had contact with North Carolina by and through their employment by or management of CCDN, LLC.
 

 21. The North Carolina General Court of Justice Bladen County, District Court Division, did not have jurisdiction over the defendants in the Bladen County actions.
 

 22. CCDN, LLC was a necessary party to each of the Bladen County actions.
 

 23. In December 2008, after Livingston filed the complaints in the Bladen County actions, Livingston was informed by counsel for CCDN that CCDN was a limited liability company existing under the laws of the State of Nevada.
 

 24. After being so informed, Livingston confirmed that CCDN was a limited liability company existing under the laws of the State of Nevada.
 

 25. Livingston did not amend the pleadings he filed in the Bladen County actions to name CCDN, LLC as a defendant in such actions.
 

 26. At the time that he filed the complaints in the Bladen County actions, Livingston knew or should have known that Bladen County District Court did not have jurisdiction over the named defendants.
 

 *133
 
 27. In May 2009, the Bladen County District Court concluded that CCDN, LLC was a necessary party to the Bladen County actions.
 

 28. The Bladen County District Court further concluded that the defendants in the
 
 *192
 
 Bladen County actions did not have minimum contacts with North Carolina.
 

 29. The Bladen County District Court dismissed the Bladen County actions without prejudice in part on the aforementioned conclusions.
 

 Livingston makes various contentions to support his argument that the above findings are unsupported by evidence, purely frivolous, and require "vacating" Conclusion 2(c). However, the main thrust of his argument seems to be that he disagrees with the DHC's finding that he "knew or should have known that Bladen County District Court did not have jurisdiction over the named defendants." He also makes the convoluted argument that if the Bladen County District Court dismissed Lawsuits 1, 2, and 3 for lack of jurisdiction, "it lacked power to decide any other issue, rendering Finding [of Fact No.] 27 ... unproven." This argument is without merit.
 

 Rule 8.4(d) prohibits "engag[ing] in conduct prejudicial to the administration of justice." N.C. Rev. R. Prof. Conduct, Rule 8.4(d) (2015).
 

 [A] showing of actual prejudice to the administration of justice is not required to establish a violation of Paragraph (d). Rather, it must only be shown that the act had a
 
 reasonable likelihood of prejudicing the administration of justice
 
 .... The phrase "conduct prejudicial to the administration of justice" in paragraph (d) should be read broadly to proscribe a wide variety of conduct, including conduct that occurs outside the scope of judicial proceedings.
 

 Sutton
 
 , --- N.C. App. at ----,
 
 791 S.E.2d at 897
 
 (quoting N.C. Rev. R. Prof. Conduct 8.4, cmt. 4).
 

 In the instant case, there is no dispute that Livingston filed Lawsuits 1, 2, and 3 on behalf of three customers of CCDN in Bladen County District Court, naming "R.K. Lock & Associates, an Illinois general partnership doing business as Credit Collections Defense Network or CCDN" as a defendant in each lawsuit. The individuals named as defendants were identified as employees of R.K. Lock & Associates, and before filing his lawsuit, Livingston failed to determine that Lock & Associates was not
 
 *134
 
 doing business as CCDN. Rather, CCDN was a Nevada limited liability company, CCDN, LLC.
 
 See
 

 Lucas
 
 ,
 
 2011 WL 721289
 
 , at *6, *6 n.3 (stating that "Plaintiffs failed to name a necessary party, being, CCDN, LLC[,]" but acknowledging that "we make no determination
 
 on the merits
 
 of this issue, as it is not properly before us" (emphasis added)).
 

 Thus, through reasonable diligence, Livingston knew or should have known that Lock & Associates was not CCDN. But, even after learning that CCDN was separate from Lock & Associates, Livingston proceeded with his flawed complaints rather than amending them or taking a voluntary dismissal and filing new complaints, properly naming the parties. Then, after the trial court dismissed the complaints without prejudice, Livingston proceeded to appeal rather than file new complaints with accurate information. The appeal was dismissed because Livingston failed to give proper notice of appeal,
 
 id.
 
 at *6, and as a result, his clients were deprived of any opportunity to pursue whatever potentially legitimate claims they had against the proper parties. Thus, Livingston's failure to amend the pleadings-his failure to take corrective action on behalf of his clients-constituted conduct prejudicial to the administration of justice. The findings of fact are supported by the evidence, and those findings in turn support Conclusion 2(c).
 

 C.
 
 Conclusion 2(d)
 

 Livingston challenges the DHC's Conclusion 2(d) as unsupported by the findings of fact, specifically Findings of Fact Nos. 30-35, as he contends those findings are not supported by competent evidence. Conclusion 2(d) states that "[b]y filing a motion for class certification without providing adequate notice for and to the class members, Livingston engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d) [.]" Findings of Fact Nos. 30-35 state as follows:
 

 30. On 7 January 2009, Livingston filed a verified complaint in Bladen County Superior Court against CCDN and others on behalf of Sharon Southwood, an individual client referred to him by CCDN, and a
 
 *193
 
 class of similarly situated plaintiffs (hereinafter referred to as "the Southwood action").
 

 31. The Southwood action was captioned: Sharon Southwood, for herself and all others similarly situated, Plaintiffs, v. The Credit Card Solution, a Texas general partnership or sole proprietorship; CCDN LLC, a Nevada limited liability company; R.K. Lock & Associates, an Illinois general partnership dba Credit Collections Defense
 
 *135
 
 Network or CCDN; Robert K. Lock, Jr., Esq.; Colleen Lock; Philip M. Manger, Esq.; and Robert M. "Bob" Lindsey, Defendants, Bladen County Superior Court file no. 09 CVS 19.
 

 32. Livingston filed a Motion for Class Certification in the Southwood action.
 

 33. In order to certify a class in the Southwood action, Livingston was required to provide adequate notice to the class members.
 

 34. In the Motion for Class Certification, Livingston stated that he did not intend to satisfy the adequate notice requirement, asserting that the notice requirement "will be Defendants' job, because they are the ones who have records of all participants in their programs."
 

 35. No class was ever certified in the Southwood action.
 

 Livingston contends that he was under no duty to provide adequate notice to class members, where he "had no contact information for the 2,219 families ... in the putative class besides his individual clients."
 

 While Rule 23 of the North Carolina Rules of Civil Procedure is silent on the issue, "fundamental fairness and due process dictates [sic] that adequate notice of the class action be given to [the members of the class]."
 
 Crow v. Citicorp Acceptance Co.
 
 ,
 
 319 N.C. 274
 
 , 283,
 
 354 S.E.2d 459
 
 , 466 (1987) (citation omitted). In a later decision, the North Carolina Supreme Court stated, "[w]e affirm our general agreement with 'the principle ... that the representative plaintiff should bear all costs relating to the sending of notice because it is he who seeks to maintain the suit as a class action.' "
 
 Frost v. Mazda Motor of Am., Inc.
 
 ,
 
 353 N.C. 188
 
 , 198,
 
 540 S.E.2d 324
 
 , 331 (2000) (alteration in original) (quoting
 
 Oppenheimer Fund, Inc. v. Sanders
 
 ,
 
 437 U.S. 340
 
 , 359,
 
 98 S.Ct. 2380
 
 , 2393,
 
 57 L.Ed. 2d 253
 
 , 269 (1978) ).
 

 In the instant case, Livingston filed a motion for class certification concurrently with filing Lawsuit 4, stating as follows:
 

 Element 6 [notice to class members] will be Defendants' job, because they are the ones who have records of all participants in their programs, and they can pay the costs of notification, since they have done this wrong and should be the only ones paying for anything to fix it.
 

 Livingston acknowledges that the class was never certified. And, pursuant to
 
 Crow
 
 , Livingston's clients-the plaintiffs in Lawsuit 4-were
 
 *136
 
 required to give notice to the members of the class as soon as possible after filing suit.
 
 See
 

 319 N.C. at 283
 
 ,
 
 354 S.E.2d at 466
 
 . Therefore, failing to take the necessary steps to properly pursue a class action on behalf of his clients and the proposed class jeopardized any chance of recovery. Thus, Livingston's position harmed his clients and was prejudicial to the administration of justice.
 

 With regard to Livingston's claim that copies of the complaint filed in Lawsuit 4 and the motion for class certification were not properly introduced into evidence, this argument also fails. At the DHC hearing, Livingston did not object to the copies as hearsay, he objected to them based on lack of authentication. And, in any event, as the statement of a party opponent, Livingston's writings were admissible as an exception to the rule against hearsay. N.C. Gen. Stat. § 8C-1, Rule 801(d) (2015). As such, Findings of Fact Nos. 30-35 are supported by the evidence, and the findings in turn support Conclusion 2(d).
 

 D.
 
 Conclusion 2(e)
 

 Livingston challenges the DHC's Conclusion 2(e) as unsupported by the findings of fact, specifically Findings of Fact Nos. 43-50, as he contends those findings are not supported by competent evidence. Conclusion 2(e) states that "[b]y falsely asserting to Arnold that he represented a national class of plaintiffs in a federal lawsuit, Livingston
 
 *194
 
 knowingly made a false statement of material fact to a third person in violation of Rule 4.1[.]" Findings of Fact Nos. 43-50 are as follows:
 

 43. On or about 11 November 2009, Livingston filed a "RICO Class Complaint" (hereinafter "the federal action") against CCDN and other defendants in the U.S. District Court for the Eastern District of North Carolina, case no. 7:09-cv-00183.
 

 44. On or about 17 November 2009, Livingston telephoned and left two voicemail messages for Andrew Arnold (hereinafter "Arnold"), an attorney representing CCDN in South Carolina litigation.
 

 45. Livingston stated in the voicemail messages that he represented "a national class" in a federal action against CCDN, asserted that Arnold had participated in money laundering by accepting legal fees from CCDN, and demanded that Arnold forfeit to Livingston all the attorney fees he had received from CCDN.
 

 *137
 
 46. Livingston further stated that, if Arnold failed to turn over funds to Livingston as demanded, Livingston would join Arnold as a defendant in the federal action.
 

 47. The fact that Livingston represented "a national class" was material to Livingston's goal of getting Arnold to believe that the litigation at issue was substantial. By establishing that the litigation at issue was substantial, Livingston could further his ultimate goal of obtaining money from Arnold.
 

 48. At the time Livingston telephoned Arnold, Livingston did not represent a national class in the federal action against CCDN.
 

 49. Livingston knew that his statements to Arnold about representing a national class were false.
 

 50. At the time Livingston telephoned Arnold, Livingston had no reasonable basis for asserting that he had a valid cause of action against Arnold.
 

 Livingston contends that these findings are unproven without recordings or transcripts of the voicemails he left for Arnold, and that because Arnold already knew that Livingston did not represent a "national class," the DHC cannot prove that he had "deceptive intent."
 

 Intent is a question that may be proved by the circumstances even in the face of denial by a defendant.
 
 See
 

 State v. Octetree
 
 ,
 
 173 N.C. App. 228
 
 , 230,
 
 617 S.E.2d 356
 
 , 358 (2005). In the instant case, Arnold, who represented CCDN, LLC in 2009 in defense of civil litigation that had been filed against it in South Carolina, testified as follows regarding Livingston's statements that he represented a national class:
 

 Q. In connection with your representation of CCDN, LLC, were you contacted by the defendant in this matter, Mr. Christopher Livingston?
 

 A. I was.
 

 ....
 

 Q. And what did he say?
 

 ....
 

 A. That he represented some individuals who had been defrauded by CCDN; that it was his belief that anyone who
 
 *138
 
 received monies from CCDN, and I-and since I was representing them, that I would have been paid a fee from CCDN, that that made me liable to his clients for any fees that I would have been paid because those monies represented the defrauded proceeds, or the proceeds from the defraud [sic] of CCDN. So that was in general what I recall about his-his communication.
 

 ....
 

 A.... I think he may have mentioned ... that at least one of the causes of-causes of action was a RICO cause of action ... and that-
 
 I do believe he had indicated that he was ... that the representative claimants were part of a larger group, and I believe he may have mentioned a class action associated with that-that representation
 
 .
 

 ....
 

 Q. Okay. At the time that Mr. Livingston represented to you that he represented a class, did you have any information about, or understanding about, whether or not that was true?
 

 *195
 
 A. No; this was the first-his phone call to me was the first I had heard of any such action.
 

 (Emphasis added).
 

 As stated previously, Livingston has acknowledged that the class was never certified. Thus, by stating that he represented a "national class" of plaintiffs to Arnold, which fact is supported by the evidence, he knowingly made a false statement of material fact to Arnold. Thus, Findings of Fact 43-50 are supported by the evidence and in turn support the DHC's Conclusion 2(d).
 

 E.
 
 Conclusion 2(f)
 

 Livingston challenges Conclusion 2(f) as unsupported by the findings of fact, specifically Findings of Fact Nos. 40-43 and 50-59, as he contends those findings are not supported by competent evidence. Conclusion 2(f) states as follows:
 

 By threatening to join and joining the defendant lawyers in the federal action when there was no basis in law or fact to do so, Livingston used means that had no substantial purpose other than to embarrass or burden a third person
 
 *139
 
 in violation of Rule 4.4(a), brought claims for which there was no basis in law or fact in violation of Rule 3.1 and engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d) [.]
 

 Findings of Fact Nos. 40-43 and 50-59 are as follows:
 

 40. Emmanuel and R. Dunn did not participate in the representation of CCDN.
 

 41. Livingston cited Emanuel & Dunn's representation of CCDN as the basis for the litigation he threatened against them.
 

 42. At the time Livingston wrote the letter to Bettis and S. Dunn, Livingston had no reasonable basis for asserting that he had a valid cause of action against Bettis and S. Dunn or their firm.
 

 43. On or about 11 November 2009, Livingston filed a "RICO Class Complaint" (hereinafter "the federal action") against CCDN and other defendants in the U.S. District Court for the Eastern District of North Carolina, case no. 7:09-cv-00183.
 

 ....
 

 50. At the time Livingston telephoned Arnold, Livingston had no reasonable basis for asserting that he had a valid cause of action against Arnold.
 

 51. On or about 23 November 2009, Livingston filed an amended complaint in the federal action.
 

 52. Livingston included the following persons as named defendants in the amended complaint for the federal action: Bettis, S. Dunn, R. Dunn and Arnold (hereinafter "defendant lawyers").
 

 53. Livingston named the defendant lawyers in their individual capacities.
 

 54. Livingston also named the law firm of Emanuel & Dunn, its four managing partners, and Arnold's firm, The Law Offices of W. Andrew Arnold, P.C., as defendants in the federal action.
 

 55. In the amended complaint Livingston filed in the federal action, Livingston alleged that CCDN and other
 
 *140
 
 defendants obtained the plaintiffs' property by wire, mail, and bank fraud and engaged in money laundering and racketeering, causing $1,044,000,000.00 in damages.
 

 56. Livingston also alleged that the defendant lawyers and their law firms had knowledge of the other defendants' fraudulent conduct and participated in fraud by accepting legal fees from the other defendants and representing the other defendants in litigation.
 

 57. Livingston did not have a valid basis in law or fact to join the defendant lawyers and their law firms in the federal action.
 

 58. Livingston's act of naming the defendant lawyers and law firms in the amended federal complaint had no substantial purpose other than to embarrass or burden those defendants.
 

 59. The federal court dismissed the defendant lawyers and their law firms from the federal action.
 

 Rule 4.4(a) states that "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person." N.C. Rev. R. Prof. Conduct, Rule 4.4(a) (2015). Rule 3.1
 
 *196
 
 states that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous ...." N.C. Rev. R. Prof. Conduct, Rule 3.1 (2015).
 

 In the instant case, the federal court dismissed the claims brought by Livingston in Lawsuit 5 against the attorneys of Emmanuel & Dunn as baseless.
 
 Taylor
 
 ,
 
 976 F.Supp.2d at 736
 
 ("Under Plaintiffs' logic, any attorney daring to serve as defense counsel to a defendant named in a RICO action automatically could be named as a RICO defendant himself. This, of course, is untenable. Concomitantly, under these facts, accepting money in exchange for providing these traditional legal services fails to go to the heart of CCDN's alleged debt elimination and credit restoration scheme." (footnote omitted)). The federal court repeatedly observes that Livingston presented "conclusory allegations" on behalf of his clients, but did not present facts to support those claims.
 
 See
 

 id.
 

 at 742
 
 ("[A]gain, this court cannot find sufficient Plaintiffs' wholly conclusory allegations ...."). Accordingly, the DHC was correct in concluding that Livingston violated Rules 3.1, 4.4(a), and 8.4(d), where he threatened to
 
 *141
 
 and did file a lawsuit against opposing counsel and members of opposing counsel's law firm without a basis in law or fact.
 

 F.
 
 Conclusion 2(g)
 

 Livingston challenges Conclusion 2(g) as unsupported by the findings of fact, specifically Findings of Fact Nos. 60-72, as he contends those findings are not supported by competent evidence. Conclusion 2(g) states as follows:
 

 By filing the Cullen complaint, Livingston brought claims for which there was no basis in law or fact in violation of Rule 3.1, engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d) and used means that had no substantial purpose other than to embarrass a third person in violation of Rule 4.4(a) [.]
 

 Findings of Fact Nos. 60-72 are as follows:
 

 60. On or about 7 January 2011, Livingston filed a complaint on behalf of former CCDN clients Kimberly Cullen ("Cullen") and William Harrison, Sr. ("Harrison") in Columbus County Superior Court, case no. 11 CVS 20 (hereafter "Cullen complaint").
 

 61. Livingston named Emanuel & Dunn, Bettis, S. Dunn, Emanuel, and R. Dunn as defendants in the case.
 

 62. Cullen was not a resident of North Carolina and had not had any contact with the defendants named in the Cullen complaint.
 

 63. Harrison had not had any contact with Emmanuel and Dunn, S. Dunn, Emanuel or R. Dunn.
 

 64. Harrison's only contact with Bettis was in Bettis's capacity as attorney for CCDN.
 

 65. In a 7 January 2011 email to opposing counsel, Philip Collins, in reference to the Cullen complaint, Livingston made the following statements: (i) "As promised, our state level campaign kicked off yesterday with the first of many Superior Court actions seeking justice for CCDN victims, carefully constructed so as not to be removable to federal court."; (ii) [regarding service] "I don't think sending swarms of deputies or piles of certified mail will do anybody any good."; and (iii) "For the rest of 2011, you
 
 *142
 
 can expect a new Cullen-type Superior Court case every month, each an improvement over its predecessors. Each will also carry its own set of written discovery, followed by depositions of all [Emmanuel & Dunn] personnel with relevant knowledge."
 

 66. The federal action was pending when Livingston filed the Cullen complaint.
 

 67. The underlying facts in the Cullen complaint were substantially the same as the underlying facts set forth in the federal action.
 

 68. Harrison was a named plaintiff in the federal action and was the only named plaintiff in the Cullen complaint with any ties to North Carolina.
 

 69. The Cullen complaint failed to establish (i) any tie between plaintiff Kimberley Cullen and North Carolina, and (ii) harm to Cullen caused by actions of the lawyer-defendants.
 

 70. Livingston alleged in the Cullen complaint that Bettis engaged in illegal conduct
 
 *197
 
 during his representation of a client in Bladen County District Court. These allegations that Livingston made against Bettis were without basis in law or fact.
 

 71. On 22 February 2011, the court dismissed the plaintiff's claims with prejudice.
 

 72. The North Carolina Court of Appeals affirmed the lower court's dismissal of the Cullen Complaint.
 

 Findings of Fact Nos. 60-72 are supported by the evidence, including the deposition testimony of attorney Lee Bettis, an associate with Emanuel & Dunn who represented the defendants as well as CCDN, LLC during the
 
 Lucas
 
 proceedings,
 
 see
 

 Cullen
 
 ,
 
 2012 WL 3573696
 
 , at *2, and attorney Philip Collins, who represented Bettis and others in the federal lawsuit filed by Livingston.
 
 Taylor
 
 ,
 
 976 F.Supp.2d at 727
 
 .
 

 First, with regard to Livingston's allegation, among others, that Bettis engaged in "illegal conduct during his representation of a client," specifically that Bettis "extend[ed] the obviously unethical offer to
 
 help Livingston draft valid complaints against Mr. Bettis's own clients
 
 ," Bettis testified (and clarified) as follows:
 

 *143
 
 Q. Didn't you offer to help me draft valid complaints against your own clients?
 

 A. What I did was I offered to help you straighten out the procedural issues that were so prevalent in your cases that we never would have gotten to the merits which would have required me to drive from here down to Bladen County and waste my client's time, everybody's time and money. So what I did was I said Chris and this is when you threatened to-wanted me to go outside and fight with you. I said, "Chris, let's just-you've sued the wrong people, you've sued the wrong corporations and it's real easy to fix it," and I told you let's fix it so we can get down to the merits and stop wasting my time, my client's time and the Court's time and you didn't like that.
 

 In the Cullen complaint, Livingston attempted to argue that Bettis's actions-described above-constituted "two or more offenses of obtaining property by false pretenses in violation of NCGS § 14-100(a)."
 
 Cullen
 
 ,
 
 2012 WL 3573696
 
 , at **9-10 (affirming the order granting the defendants' motion for judgment on the pleadings with regard to the Cullen complaint). As this Court summarized,
 

 [t]he majority of plaintiffs' claims [brought by Livingston] are based entirely on the conduct of Mr. Bettis while representing the
 
 Lucas
 
 defendants and CCDN, LLC in the
 
 Lucas
 
 litigation. The complaint alleges that Mr. Bettis acted with an improper purpose, made knowingly fraudulent arguments, and sought to delay any recovery for the plaintiffs until CCDN, LLC could go out of business, rendering any recovery against it impossible.
 

 Id.
 
 at *3. Thus, as this Court's opinion affirming the trial court's grant of the defendants' motion for judgment on the pleadings was based on "the [in]sufficiency of the allegations" in the Cullen complaint,
 
 see
 

 id.
 
 at *5, the DHC's findings of fact are supported by the evidence.
 

 Second, with regard to the federal lawsuit, Collins, the attorney who represented Bettis and others, testified that the federal court disposed of the matters on the defendants' motion for judgment on the pleadings as follows: "Dismissed all the claims with the exception of the conversion and constructive trust,"
 
 see
 

 Taylor
 
 ,
 
 976 F.Supp.2d at 745, 755
 
 , and later dismissed those claims as well. Collins also testified that the factual allegations in the
 
 Cullen
 
 case, Lawsuit 4, were similar to those contained in the federal lawsuit,
 
 Taylor v. Bettis
 
 , Lawsuit 5. Finally, Finding of Fact
 
 *144
 
 No. 65,
 
 see infra
 
 Section G, is taken verbatim from Plaintiff's Exhibit 21. Accordingly, it is also supported by the evidence, and this finding in turn supports the DHC's ultimate conclusion Livingston violated the Rules of Professional Conduct by filing the Cullen complaint in Bladen County Superior Court.
 

 G.
 
 Conclusion 2(h)
 

 Livingston challenges the DHC's Conclusion 2(h) as unsupported by Finding of Fact Nos. 65, as he contends that finding is not supported by competent evidence. Conclusion 2(h) states that "[b]y threatening to file monthly additional lawsuits based on similar
 
 *198
 
 allegations against Bettis and Emmanuel & Dunn and threatening to engage in separate discovery for each lawsuit, Livingston used means that had no substantial purpose other than to embarrass or burden a third person in violation of Rule 4.4(a)." Finding of Fact No. 65 states, in relevant part, as follows:
 

 65. In a 7 January 2011 email to opposing counsel, Philip Collins, ... Livingston made the following statements: ... "
 
 For the rest of 2011, you can expect a new Cullen-type Superior Court case every month
 
 , each an improvement over its predecessors. Each will also carry its own set of written discovery, followed by depositions of all [Emmanuel & Dunn] personnel with relevant knowledge."
 

 (Emphasis added).
 

 Comment 2 to Rule 4.4 of the Rules of Professional Conduct states as follows:
 

 Threats, bullying, harassment, insults, slurs, personal attacks, unfounded personal accusations generally serve no substantial purpose other than to embarrass, delay, or burden others and violate this rule. Conduct that serves no substantial purpose other than to intimidate, humiliate, or embarrass lawyers, litigants, witnesses, or other persons with whom a lawyer interacts while representing a client also violates this rule.
 

 N.C. Rev. R. Prof. Conduct, Rule 4.4, cmt. 2.
 

 As stated
 
 supra
 
 in Section F, this finding quotes verbatim the text of the email Livingston sent to Collins on 7 January 2011. Livingston does not dispute that he sent the email or made the threat that "[f]or the rest of 2011, you can expect a new
 
 Cullen
 
 -type Superior Court case every month ...." The email also includes other vaguely threatening
 
 *145
 
 statements such as, "it is not our goal to personally bankrupt the lawyers at E&D [ (Emanuel & Dunn) ] if recovery can be had some other way" and "I really, really suggest, not for the first time, that we all be content with $3 million for the class of CCDN victims .... This will take care of fall fees and costs, too, and I will not move for sanctions, and your individual clients' assets will be safe." Accordingly, Finding of Fact No. 65 is supported by the evidence, which finding in turn supports the DHC's conclusion that Livingston violated Rule 4.4(a) by threatening to file lawsuits monthly where his only purpose in doing so was to coerce a settlement.
 

 III
 

 Livingston also argues the DHC ordered excessive discipline where no evidence justified his suspension, specifically challenging disciplinary Findings of Fact Nos. 1-10 as unsupported by the evidence, and the DHC's Conclusions of Law Nos. 1 and 4-10 as failing the whole record test. We disagree.
 

 This Court reviews additional findings of fact and conclusions of law with respect to the disciplinary phase under the whole record test.
 
 See
 

 Talford
 
 ,
 
 356 N.C. at 634
 
 ,
 
 576 S.E.2d at 311
 
 ("[T]he whole-record test must be applied separately to each of the two phases [ (adjudicatory and dispositional) ].").
 

 "Suspension [of an attorney's license]," is ... a form of punishment imposed for misconduct that either results in or threatens
 
 significant
 
 harm to "a client, the administration of justice, the profession or members of the public." Thus, when imposed, findings must be made explaining how the misconduct caused significant harm or threatened significant harm, and why the suspension of the offending attorney's license is necessary in order to protect the public.
 

 Id.
 
 at 637,
 
 576 S.E.2d at 312-13
 
 (first alteration in original) (internal citation omitted).
 

 The trial court made the following additional findings of fact regarding discipline which defendant challenges on appeal:
 

 1. R. Dunn did not participate in his firm's representation of CCDN in defense of the claims [Livingston] brought against CCDN on behalf of his clients.
 

 2. Pat Leigh Pittman was a transactional lawyer who did not participate in her
 
 *199
 
 firm's representation of the claims [Livingston] brought against CCDN on behalf of his clients.
 
 *146
 
 3. Joanne K. Partin was a transactional lawyer who did not participate in her firm's representation of the claims [Livingston] brought against CCDN on behalf of his clients.
 

 4. Robert L. Emmanuel was an eighty year old, semi-retired lawyer who did not participate in his firm's representation of CCDN in defense of the claims [Livingston] brought against CCDN on behalf of his clients.
 

 5. When R. Dunn was served with the complaint in the federal action, media was present and media reported about the lawsuit [Livingston] filed.
 

 6. A long-time client of Emmanuel & Dunn questioned the ability of Emmanuel & Dunn to continue in its representation of this client because the client had become aware of the allegations [Livingston] made against Emmanuel and Dunn in the federal action.
 

 7. Emmanuel & Dunn had to obtain legal representation to defend against the lawsuits [Livingston] filed against Emmanuel & Dunn and its lawyers.
 

 8. Arnold had to obtain legal representation to defend him[self] against the allegations [Livingston] made against him and his firm in the federal action.
 

 9. It was costly to defend against the frivolous actions [Livingston] brought against the defendant lawyers and their law firms.
 

 10. On 9 August 2011, [Livingston] was sanctioned by the United States District Court for the Eastern District of North Carolina, Southern Division for making baseless allegations that lawyer defendants in Caraballo v. Bagbeh had engaged in racketeering, wire fraud, money laundering and receipt of illegally obtained funds.
 

 A.
 
 Five-Year Suspension
 

 The DHC's additional findings of fact are supported by the evidence presented in Phase I of the trial as well as by additional evidence presented in Phase II. With regard to "significant harm" caused by Livingston's actions, Raymond Dunn of Emanuel & Dunn testified as follows:
 

 *147
 
 A The TV news coverage was allegedly Mr. Livingston saying that our firm were fraudsters and money launderers, and the person who was stating that represented himself to be Mr. Livingston on the TV.
 

 ....
 

 A We're a small firm. We've been in existence ... since 1952. We don't advertise. The only way we get business is by word of mouth and our reputation, and when there's media coverage alleging fraudulent conduct, it impacts a small town lawyer. We don't advertise. It's a significant impact on your business and on your reputation, which is the only way that we get business.
 

 Collins testified about Livingston's "scurrilous allegations" and testified to the chilling effect on the profession caused by Livingston's filing such lawsuits against opposing counsel. He also testified that the defense of the lawsuits cost approximately $200,000.00. In a federal court order sanctioning Livingston in 2011 for making similar allegations against an opposing counsel, and which was admitted into Phase II of the hearing without objection by Livingston, the federal court noted as follows:
 

 The court must also consider the minimum necessary to deter future abuse. This factor is a difficult one, as Mr. Livingston sees no error in his ways. Furthermore, the sarcastic nature of his comments toward this court contained within the filings leads the court to believe that sanctions may not deter Mr. Livingston at all.
 

 Caraballo v. Bagbeh
 
 , NO. 7:10-CV-122-H,
 
 2012 WL 12914657
 
 , at *2 (E.D.N.C. June 14, 2012) (unpublished).
 

 In its order, the DHC explained its analysis of the disciplinary factors it was required to consider and which it did consider, including the harm to Livingston's clients, the profession, and the administration of justice. Accordingly, imposing a five-year suspension with an opportunity to petition for a stay after serving two years active and upon demonstrating compliance with the enumerated conditions was fully supported by the harm shown.
 
 See
 

 Talford
 
 ,
 
 356 N.C. at 637
 
 ,
 
 576 S.E.2d at 312-13
 
 .
 

 *200
 
 B.
 
 Administrative Costs
 

 The Order of Discipline requires defendant to pay the administrative fees and costs of the proceeding within thirty days of service of the statement by the Secretary of the State Bar. Livingston did not object to
 
 *148
 
 inclusion of this provision in the order and argues for the first time on appeal that the administrative fees assessed against him are "not permitted by law." However, our General Statutes state that the State Bar Council "may charge and collect the following fees in amounts determined by the Council: ... (5) An administrative fee for any attorney against whom discipline has been imposed."
 
 N.C. Gen. Stat. § 84-34.2
 
 (2015). Accordingly, Livingston's argument is without merit and is overruled.
 

 In conclusion, where the DHC's conclusions of law that Livingston violated the Rules of Professional Conduct are supported by the findings of fact which are supported by the evidence and where defendant's conduct caused significant harm or potentially significant harm to the public, the profession, or the administration of justice, the order disciplining Livingston and imposing a five-year suspension with an opportunity to petition for a stay after two years is
 

 AFFIRMED.
 

 Judges DAVIS and INMAN concur.
 

 [1]
 

 The defendants in Lawsuit 4 subsequently removed the case to federal district court and the matter was disposed of in the federal court's opinion,
 
 Taylor v. Bettis
 
 ,
 
 976 F.Supp.2d 721
 
 , 727 (2013).
 

 [2]
 

 Livingston filed a motion for reconsideration of the dismissals under Rule 59, which motion was denied. Livingston appealed, and this Court held that Livingston failed to give notice of appeal of the trial court's order dismissing the complaints and only appealed the denial of the motion to reconsider. This Court dismissed the appeal and vacated an order imposing Rule 11 sanctions in a consolidated, unpublished opinion.
 
 Lucas v. R.K. Lock & Assocs.
 
 , Nos. COA10-874, COA10-875, COA10-891,
 
 2011 WL 721289
 
 , at *6 (N.C. Ct. App. Mar. 1, 2011) (unpublished),
 
 rev. denied
 
 ,
 
 365 N.C. 347
 
 ,
 
 719 S.E.2d 17
 
 (2011).
 

 [3]
 

 Defendant brings forth no argument in support of his appeal of the other orders; therefore, per Rule 28(a) of the North Carolina Rules of Appellate Procedure, we deem any issues related to those orders abandoned.
 
 See
 
 N.C. R. App. P. 28(a) (2017) ("Issues not presented and discussed in a party's brief are deemed abandoned.");
 
 see also
 
 N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned."). Accordingly, as defendant has abandoned any argument related to these orders, we dismiss any appeal therefrom.
 
 See
 

 State v. Bacon
 
 , --- N.C. App. ----, ----,
 
 803 S.E.2d 402
 
 , 406 (2017) ("Defendant has abandoned this argument, and we dismiss it.").
 

 [4]
 

 Indeed, the following facts were previously before this Court and set out in this Court's opinion in
 
 Lucas
 
 as follows:
 

 Livingston had previously entered into an "Associate Attorney Agreement" (the agreement) with Credit Collections Defense Network (aka CCDN and CCDN, LLC), which described itself in the agreement as "a national network of consumer protection attorneys, paralegals and administrative support personnel ('CCDN, LLC')[.]"
 
 Pursuant to the agreement, Livingston was to represent clients referred by CCDN, LLC. He would provide legal services to those clients and they would pay a fee to CCDN, LLC. Livingston would be paid by CCDN, LLC, pursuant to a fee schedule included in the agreement
 
 .
 

 2011 WL 721289
 
 , at *1 (emphasis added).
 

 [5]
 

 The rule in effect at the time of Livingston's conduct was Rule 5.5(d), but this rule was amended in 2017 and is now Rule 5.5(f).