IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-718

No. COA22-135

Filed 1 November 2022

Wake County, No. 18 DHC 41

THE NORTH CAROLINA STATE BAR, Plaintiff,

v.

PATRICK MICHAEL MEGARO, Attorney, Defendant.

Appeal by Defendant from order entered 27 April 2021 by the Disciplinary Hearing Commission of the North Carolina State Bar. Heard in the Court of Appeals 7 September 2022.

> *The North Carolina State Bar, by Deputy Counsel David R. Johnson, Counsel Katherine Jean, and Deputy Counsel Carmen Hoyme Bannon, for Plaintiff-Appellee.*
>
> *Patrick Michael Megaro, Pro se, Defendant-Appellant.*

COLLINS, Judge.

¶ 1     Defendant Patrick Michael Megaro appeals from an order of discipline entered by the Disciplinary Hearing Commission of the North Carolina State Bar ("DHC") suspending his law license for five years and allowing him to seek a stay of the balance of the suspension after three years if he complies with certain conditions. Because there is substantial evidence to support the DHC's findings of fact, and because the findings of fact support the conclusions of law, we affirm.

## I. Procedural History and Factual Background

¶ 2 In 1983, brothers Henry McCollum and Leon Brown were convicted of the rape and murder of 11-year-old Sabrina Buie and sentenced to death. On appeal, the North Carolina Supreme Court granted McCollum and Brown new trials. *See State v. McCollum*, 321 N.C. 557, 364 S.E.2d 112 (1988). McCollum was retried and again convicted of first-degree rape and first-degree murder. The trial court arrested judgment on the rape conviction and sentenced McCollum to death for the murder conviction. At sentencing, the jury found as mitigating circumstances that McCollum "was mentally retarded, that the offense was committed while he was under the influence of mental or emotional disturbance, that he is easily influenced by others, and [that] he has difficulty thinking clearly under stress."

¶ 3 Brown was retried, convicted of first-degree rape, and sentenced to life in prison. In the trial court's judgment, it recommended Brown receive psychological treatment in prison. On appeal, this Court found no error, but the opinion included the trial court's order denying a motion to suppress which found that Brown "has an I.Q. variously tested between 49 and 65, but has been generally classified as suffering from mild mental retardation[.]" *State v. Brown*, 112 N.C. App. 390, 393, 436 S.E.2d 163, 165 (1993).

¶ 4 In April 1995, McCollum was represented by Kenneth Rose, an attorney with the Center for Death Penalty Litigation, and attorneys from Wilmer Hale, in filing a

motion for appropriate relief ("MAR"). The MAR alleged that an incriminating statement made by McCollum was unreliable due to his intellectual disabilities, which were established by opinions from four mental health professionals.

¶ 5 In January 2002, Rose represented McCollum in filing an amended MAR "based on [McCollum's] subaverage intellectual functioning and significant limitations in adaptive functioning." In support of the MAR, McCollum submitted a 2002 affidavit of Dr. Rogers in which Dr. Rogers averred that "in her 1995 testing McCollum had a full-scale IQ of 68 and significant subaverage intellectual functioning that placed him in the lowest 2-3 percent of the population in overall intellectual functioning." McCollum also submitted a 2002 affidavit of Dr. Rumer, who averred that McCollum "had a history of subaverage scores on intellectual testing with full-scale scores of 56, 61 and 69, and adaptive functioning deficits."

¶ 6 In August 2014, Rose and Vernetta Alston, also an attorney with the Center for Death Penalty Litigation, filed an MAR alleging McCollum was innocent based in part on results of DNA testing done on a cigarette butt found at the scene of the murder; the DNA did not match either brother, but instead matched an inmate "then serving a life sentence for the murder of a woman in the same area as Buie, a month after Buie's murder." Brown filed a similar MAR through separate counsel. The trial court granted McCollum's and Brown's MARs, vacated their convictions and judgments, and released them from prison after having served 31 years.

Attorneys Mike Lewis, Mark Rabil, and Tom Howlett agreed to represent McCollum and Brown on a contingency fee basis in civil litigation for the alleged misconduct of law enforcement officers involved in the investigation and prosecution of the brothers. Rose, Alston, and attorneys with Wilmer Hale agreed to represent McCollum and Brown on a pro bono basis to file pardon petitions with the governor and to seek compensation in the Industrial Commission as persons wrongfully convicted of felonies, pursuant to N.C. Gen. Stat. § 148-84. On 11 September 2014, Rose and Alston filed petitions for pardons of innocence on behalf of the brothers. On 15 September 2014, Rose and Alston received notice from the Clemency Administrator that "[a]ll necessary documents have been received and this request is now being processed. You will be notified when a decision has been made on this request." After McCollum's and Brown's cases caught the attention of the media, "McCollum and Brown began receiving charitable donations and financial assistance from various sources[.]"

In January 2015, Kim Weekes and Deborah Pointer, who were not attorneys and who referred to themselves as "consultant advisors," contacted Brown's sister, Geraldine Brown Ransom, claiming they could help McCollum and Brown. Weekes and Pointer entered into an agreement with Ransom, who was not a guardian for either McCollum or Brown at that point, to serve as activists for the brothers and to assist with their pardon process. Weekes and Pointer notified Rose that they were

authorized to represent McCollum and Brown "in all and any of the Civil/Litigation of the Pardon/Fundraising of NC matters."

¶ 9      Weekes and Pointer contacted Defendant about representing the brothers. Defendant "read news accounts of McCollum and Brown's cases, reviewed transcripts of their MAR hearings that he found online, and did preliminary research on their cases." Before Defendant met with McCollum and Brown, Pointer warned Defendant that Ransom requested that Defendant refrain from discussing money amounts in front of the brothers. Pointer also told Defendant that Ransom would give the brothers a monthly stipend. Defendant entered into a representation agreement with McCollum, Brown, and Ransom. At the time they entered into the agreement, petitions for pardons had already been filed for McCollum and Brown. The representation agreement provided the following: Defendant would collect a contingency fee of 27-33% of any monetary recovery from Robeson County, the Red Springs Police Department, and the State of North Carolina; McCollum and Brown were conveying to Defendant an irrevocable interest in net proceeds arising from any recovery; and Defendant was entitled to the contingency interest in the outcome of the case regardless of whether McCollum and Brown terminated the representation agreement.

¶ 10      Defendant began working with Multi Funding, Inc., to obtain "immediate funding through loans" for McCollum and Brown. Defendant advanced $1,000 cash

to each McCollum and Brown and facilitated the brothers each getting loans from Multi Funding for $100,000 at 19% interest, compounded every six months. Defendant ensured that Weekes and Pointer were paid $10,000 from the initial loan proceeds to the brothers. Defendant sent letters to Rose and Howlett, "warning them to never contact McCollum and Brown again as it would violate the 'rules of ethics' and would be 'actionable as tortious interference of contract.'"

¶ 11    After the governor granted pardons of innocence to the brothers, Defendant filed a joint petition in the Industrial Commission seeking compensation for McCollum and Brown, pursuant to N.C. Gen. Stat. § 148-84. The attachments to the petition were almost exclusively the work product of Rose and Alston. Defendant also filed suit in the United States District Court for the Eastern District of North Carolina on behalf of the brothers against various parties alleged to be responsible for their wrongful conviction and incarceration. In August 2015, Brown, who suffers from bi-polar disorder and schizophrenia, was hospitalized after a breakdown. Defendant filed a petition in Cumberland County to have Brown declared incompetent and proposed that Ransom be appointed Brown's guardian.

¶ 12    On 2 September 2015, after a brief hearing, McCollum and Brown were each awarded $750,000, the statutorily mandated amount of compensation under N.C. Gen. Stat. § 148-84. Defendant was issued a check for $1.5 million; Defendant took

$500,000 as a contingency fee. The brothers were left with $500,000 each, and of this money:

> Defendant used nearly $110,000.00 each of McCollum and Brown's Industrial Commission award, totaling $220,000.00, to repay the loans he facilitated their obtaining . . . .
>
> Defendant charged a combined total of $21,173.88 in costs and expenses to McCollum and Brown for the Industrial Commission process. These charges included costs related to the pardon process and related to Brown's incompetency proceeding.
>
> Defendant used $25,972.14 of the Industrial Commission award to repay money he and his firm advanced to McCollum and Brown prior to their Industrial Commission award[.]

¶ 13    After these deductions, Defendant disbursed $358,363.28 to McCollum. After McCollum spent all the funds, Defendant helped McCollum obtain a second loan for $50,000 at 18% interest, compounded every six months. Defendant facilitated McCollum obtaining a third loan for $15,000 at 18% interest, compounded every six months. After Ransom was removed as Brown's guardian for mismanaging his funds, Defendant helped Ransom "get a $25,000.00 loan from [Multi Funding] against any future recovery made by Brown, with the loan proceeds sent to [Ransom] purportedly for Brown's rent." As a result of the loan, Multi Funding perfected a lien for $25,000 against any future recovery made by Brown.

¶ 14 On 1 February 2017, Derrick Hamilton, a friend of and occasional videographer for Defendant, wired Defendant $30,000 – $20,000 of which was for McCollum's benefit and $10,000 of which was to serve as a loan for Defendant's benefit. Defendant failed to disburse the $10,000 intended for him from the trust account in a manner that identified the funds as Defendant's loan proceeds.

¶ 15 During settlement discussions with the Town of Red Springs, counsel for the Town of Red Springs raised McCollum's competence to enter into a settlement agreement. In anticipation of submitting a settlement proposal, Defendant engaged Dr. Thomas Harbin to evaluate McCollum's competency to enter into a settlement agreement. Despite contrary findings in an earlier report, Dr. Harbin concluded that "McCollum was able to manage his own financial and legal affairs, and to make or communicate important decisions concerning his person and finances."

¶ 16 In April 2017, Defendant submitted a settlement proposal for McCollum and Brown's civil suit for $500,000 each to the federal District Court. Defendant claimed that the brothers were competent to enter into the representation agreement and the settlement agreement and asked the Court to approve the settlement and Defendant's 33% fee. The proposed settlement provided that the liens securing the Multi Funding loans would be paid out of the settlement proceeds, leaving McCollum with $178,035.58 and Brown with $403,493.96. During a hearing related to approval of the proposed settlement, federal District Court Judge Terrance Boyle rejected Dr.

Harbin's evaluation as unpersuasive and appointed Raleigh attorney Raymond Tarlton as Guardian Ad Litem for McCollum. Tarlton filed a motion asking the Court to determine whether Defendant's representation agreement with McCollum was valid based on McCollum's incapacity. Defendant filed a motion to discharge Tarlton as Guardian Ad Litem and to halt any further inquiry as to McCollum's competency. Judge Boyle entered an order directing Dr. George Corvin to conduct a competency evaluation for McCollum.

¶ 17    Dr. Corvin submitted a comprehensive report, finding that McCollum "clearly suffers from psychological and intellectual limitations impairing his ability to manage his own affairs and make/communicate important decisions regarding his life without the assistance of others." Judge Boyle entered an order finding that McCollum was incompetent to manage his own affairs and that the representation agreement between Defendant and McCollum was invalid. The Court approved the settlement proposal, but not Defendant's fee. Defendant was terminated as McCollum's counsel by Tarlton. Defendant's law partner filed a motion challenging Tarlton's authority to terminate Defendant. The federal District Court ordered Defendant removed from the case for good cause shown. On 29 January 2021, Dr. Corvin evaluated McCollum to determine whether McCollum was competent to enter into a representation agreement with Defendant, and whether McCollum was competent to enter into loan agreements with Multi Funding. Dr. Corvin found:

McCollum has a well-documented and extensive psychosocial history, and he continues to exhibit considerable evidence of his well-established intellectual developmental disorders. McCollum's intellectual disorders are known to be static in nature, meaning there is no known treatment to reverse the cognitive limitations inherent in such conditions;

McCollum continued to display evidence of impaired executive functioning (above and beyond that associated with his known intellectual developmental disorder) stemming from his previously diagnosed neurocognitive disorder. McCollum tends to make decisions about circumstances (and people) in a rather impulsive manner without consideration of (or adequate understanding of) the subtleties and complexities that are most commonly associated with such decisions;

McCollum continues to experience symptoms consistent with a diagnosis of Post-Traumatic Stress Disorder stemming from his prior lengthy incarceration on death row after having been convicted of a crime that he did not commit. McCollum experiences intense physiological and psychological reactivity (i.e., flashbacks) when he sees police officers in his community, stating that when he sees them 'it makes me think of what happened to me, it scares me. It reminds me of what happened out there';

McCollum has been unable to pass the written portion of the test to obtain a driver's license. McCollum agreed to 'sign the papers' to engage Defendant's representation because 'he gave us money. I agreed to sign the papers for him to handle my pardon and civil suit – because he gave us money, found me a better place. But he had me fooled.' Regarding Defendant, McCollum 'thought he was doing a good job, but I didn't know that he was taking that much money. I had no idea how much money they were supposed to take'; and

McCollum remains unable to make and communicate important decisions regarding his person and his property,

without the regular assistance of others. McCollum met the statutory definition of 'incompetent adult' as detailed in N.C. Gen. Stat. § 35A-1101(7) at the time that he entered into the representation agreement with Defendant and when he entered into the loans with [Multi Funding].

¶ 18 On 20 September 2018, the North Carolina State Bar filed a disciplinary action against Defendant alleging that Defendant had engaged in professional misconduct in his representation of McCollum and Brown. The case was tried before the DHC, and the DHC concluded that Defendant violated the Rules of Professional Conduct involving, inter alia, "dishonesty, excessive fees, [and] conduct prejudicial to the administration of justice." The order of discipline ("Order") suspended Defendant's law license for five years and allowed Defendant to seek a stay of the balance of the suspension after three years if he complied with certain conditions, including a $250,000 restitution payment to McCollum and Brown. Defendant filed notice of appeal.

## II. Discussion

¶ 19 Defendant first contends that, "utilizing the whole record test, the findings of fact and conclusions of law in the [Order] were not supported by clear, cogent, and convincing evidence[.]" (capitalization omitted).

¶ 20 Appeals from orders of the DHC are limited to "matters of law or legal inference." N.C. Gen. Stat. § 84-28(h) (2021). We apply the "whole record test," "which requires the reviewing court to determine if the DHC's findings of fact are

supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law[.]" *N.C. State Bar v. Livingston*, 257 N.C. App. 121, 126, 809 S.E.2d 183, 188 (2017) (citation omitted).

> Such supporting evidence is substantial if a reasonable person might accept it as adequate backing for a conclusion. The whole-record test also mandates that the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn. Moreover, in order to satisfy the evidentiary requirements of the whole-record test in an attorney disciplinary action, the evidence used by the DHC to support its findings and conclusions must rise to the standard of clear, cogent, and convincing.

*N.C. State Bar v. Talford*, 356 N.C. 626, 632, 576 S.E.2d 305, 309-10 (2003) (brackets, quotation marks, and citations omitted). "Clear, cogent[,] and convincing describes an evidentiary standard stricter than a preponderance of the evidence, but less stringent than proof beyond a reasonable doubt." *N.C. State Bar v. Sheffield*, 73 N.C. App. 349, 354, 326 S.E.2d 320, 323 (1985) (citation omitted). "It has been defined as evidence which should fully convince." *Id.* (quotation marks and citation omitted). The whole record test must be applied separately to the adjudicatory phase and the dispositional phase. *Talford*, 356 N.C. at 634, 576 S.E.2d at 311.

## A. Findings of Facts and Conclusions of Law

Defendant first argues that "Charges 7, 8, 12, and 19" are not supported by a list of "implicit factual findings" contrived by Defendant. As Defendant's "implicit

factual findings" are not facts found by the DHC, we cannot review them to determine if they were supported by the evidence.

¶ 22         Defendant does appear to argue that Finding of Fact 28 was not supported by the requisite evidence. Defendant does not challenge any of the remaining 129 findings of fact, stating that "[t]he word limit under the Rules prevents further dissection of all the factual findings in the Order of Discipline." The remaining findings of fact are thus binding on appeal. *N.C. State Bar v. Key*, 189 N.C. App. 80, 87, 658 S.E.2d 493, 498 (2008). Finding of Fact 28 states, "McCollum and Brown had been consistently diagnosed as mentally retarded with adaptive skills deficits and were unable to understand their confessions[.]"

¶ 23         The unchallenged findings of facts include the opinions of four mental health professionals establishing McCollum's intellectual disabilities in support of the 1995 MAR:

> Psychologist Dr. Faye Sultan, Ph. D., concluding, *inter alia*, that McCollum was mentally retarded with intellectual functioning falling in the range of an eight to ten-year-old, had poor reading comprehension, and was highly suggestible and subject to the influence of others, particularly authority figures;
>
> Neuropsychologist Dr. Helen Rogers, Ph. D., concluding, *inter alia*, that McCollum was mentally retarded with neuropsychological testing showing he scored in the 'impaired' or 'seriously impaired' range, his ability to understand verbal communication was severely impaired, he had cognitive impairment beyond that expected for his level of mental retardation, and he was strongly

> suggestible and generally not capable of understanding and weighing the consequences of his choices;
>
> Psychologist Dr. Richard Rumer, Ph. D., concluding, *inter alia*, that McCollum was mentally retarded with severely limited cognitive functioning, was susceptible to the influence of others, and demonstrated weakness in his ability to plan and carry out complex activities; and
>
> Dr. George Baroff, Ph. D., Professor of Psychology at the University of North Carolina, concluding, *inter alia*, that McCollum suffered mental retardation – placing him at the bottom 3 percent of the general population – and a neuropsychological impairment, and that he had a reading level of third grade and a listening comprehension level at first grade.

Additionally, the unchallenged finding of fact detailing Dr. Corvin's evaluation established in relevant part that

> McCollum has a well-documented and extensive psychosocial history, and he continues to exhibit considerable evidence of his well-established intellectual developmental disorders. McCollum's intellectual disorders are known to be static in nature, meaning there is no known treatment to reverse the cognitive limitations inherent in such conditions[.]

Other relevant unchallenged findings of fact include:

> 37. McCollum and Brown were easily manipulated and were particularly susceptible to manipulation and financial coercion, given their intellectual disabilities, decades in prison, and relative poverty.
>
> . . .
>
> 47. . . . In the second parapraph of the [Industrial Commission] petition, Defendant represented to the Industrial Commission: "At all time hereinafter mentioned, both men had and still have limited mental

abilities. Mr. McCollum's Intelligence Quotient (IQ) has been scored at 56, while Leon Brown's IQ has been scored at 54. Both of these IQ scores are within the intellectually disabled range, classified by some as mild retardation.

. . .

54. Defendant recognized the adaptive functioning deficiencies of his clients in Brown's incompetency petition stating: 'Both brothers need help with budgeting their monthly allowance because they are unable to understand the concept of paying utility bills and making purchases. One thing is clear: neither Leon Brown nor Henry McCollum have a concept of budgeting or spending limits, nor do they have any experience of budgeting money, let alone large sums of money.'

. . .

103. As threshold matters, Judge Boyle, citing U.S. Supreme Court documentation a dissenting opinion in a U.S. Supreme Court decision denying a writ of certiorari that McCollum was mentally retarded, had an IQ between 60 and 69, had a mental age of 9-years-old, and reads at a second-grade level, raised concerns about the competency of McCollum and Brown to enter into the settlement agreement and about Defendant's conflict of interest by entering into representation agreements with clients who were incompetent.

¶ 24 Furthermore, the MAR transcript, which Defendant reviewed prior to meeting McCollum and Brown, supports this finding:

Sharon Stellato, a staff member of The North Carolina Actual Innocence Commission, testified in extensive detail at the September 2, 2014 MAR hearing about the intellectual disabilities of McCollum and Brown. Consistent with the background of McCollum and Brown, Stellato noted that both had been diagnosed as mentally retarded. Testing in 1983 showed Brown's full-scale IQ was 54. Testing of McCollum at age 15 showed his full-

scale IQ was 56 and his reading comprehension at the second-grade level.

Based on the whole record, clear, cogent, and convincing evidence supports the Order's finding of fact that "McCollum and Brown had been consistently diagnosed as mentally retarded with adaptive skills deficits and were unable to understand their confessions[.]"

"Charges 7, 8, 12, and 19" do not correspond to any numbered allegations in the complaint, nor do they correspond to any findings of fact or conclusions of law in the Order. Construing Defendant's brief liberally, however, "Charges 7, 8, 12, and 19" refer to the violations of the Rules of Professional Conduct set forth in Conclusions of Law 2(b), 2(c), 2(f), and 2(k), and Defendant is arguing that the findings of fact do not support these conclusions. These conclusions state:

> By entering into a representation agreement with his clients when he knew they did not have the capacity to understand the agreement, Defendant engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c) and engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d);
>
> By having McCollum sign off on a settlement agreement and representing to a court that McCollum had consented to the settlement when Defendant knew McCollum did not have the capacity to understand the agreement, Defendant made a false statement to a tribunal and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation that was prejudicial to the administration of justice in violation of Rule 3.3(a), Rule 8.4(c), and Rule 8.4(d);

> By signing various Attorney Acknowledgements of Explanation of Terms to Plaintiff, Of Irrevocable Lien and Assignment to Multi Funding, Inc., claiming to Multi Funding, Inc. that he had explained the terms of the loan agreements to McCollum and Brown when they were not competent to understand those terms or enter into those agreements, Defendant made a material misrepresentation to Multi Funding, Inc. and thereby engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

> By entering into a retainer agreement with McCollum that was invalid due to McCollum's lack of competency and then arguing that McCollum was competent in an effort to protect his fee despite such arguments potentially harming McCollum's then-current claims against Robeson County, the Red Springs Police Department, and the State of North Carolina, Defendant engaged in a conflict of interest, as Defendant's representation of McCollum was materially limited by Defendant's personal interest in defending his fee, in violation of Rule 1.7.

¶ 27     The Order's findings of fact support the conclusion that Defendant knew McCollum and Brown did not have the capacity to understand the representation agreement or settlement agreement. Defendant "read news accounts of McCollum and Brown's cases, reviewed transcripts of their MAR hearings that he found online, and did preliminary research on their cases." The MAR transcripts "revealed that McCollum and Brown had low IQs and were unable to understand the confessions they were coerced into signing[.]" Defendant represented in his petition for compensation that "both men had and still have limited mental abilities. Mr. McCollum's Intelligence Quotient (IQ) has been scored at 56, while Leon Brown's IQ

has been scored at 54. Both of these IQ scores are within the intellectually disabled range, classified by some as mild retardation." Defendant also acknowledged that "neither Leon Brown nor Henry McCollum have a concept of budgeting or spending limits, nor do they have any experience of budgeting money, let alone large sums of money." Dr. Corvin also concluded that McCollum "clearly suffers from psychological and intellectual limitations impairing his ability to manage his own affairs and make/communicate important decisions regarding his life without the assistance of others."

¶ 28        Accordingly, clear, cogent, and convincing evidence supports the Order's findings of fact, and the findings of fact support the DHC's conclusions that it was dishonest for Defendant to enter into the representation agreement with McCollum and Brown; that it was prejudicial to the administration of justice for Defendant to have McCollum sign the settlement agreement and deceitful for him to represent to the Court that McCollum had consented to the settlement; and that it was dishonest for Defendant to claim to Multi Funding that he explained the terms of the loan agreements to McCollum and Brown.

### B. $250,000 Restitution Payment

¶ 29        Defendant alleges that the $250,000 restitution payment to McCollum and Brown is not supported by clear, cogent, and convincing evidence.

¶ 30 The DHC is given broad disciplinary discretion. "Misconduct by any attorney shall be grounds for . . . [s]uspension for a period up to but not exceeding five years, any portion of which may be stayed upon reasonable conditions to which the offending attorney consents[.]" N.C. Gen. Stat. § 84-28(c)(2) (2021). "Any order disbarring or suspending an attorney may impose reasonable conditions precedent to reinstatement." *Id.* at § 84-28(c).

¶ 31 Defendant received $500,000 for preparing compensation petitions and attending the Industrial Commission hearing on behalf of McCollum and Brown. Defendant's attachments to the petitions for compensation were almost exclusively Rose and Alston's work product. The transcript for the Industrial Commission hearing is seven pages long and "[t]he State did not oppose compensation for McCollum and Brown[.]" A contingent fee for the representation in the Industrial Commission was improper because McCollum and Brown were "entitled to the maximum compensation authorized by N.C. Gen. Stat. § 148-84: $750,000 each." The $250,000 restitution payment ordered by the DHC is a conservative estimate of the amount Defendant collected that he was not entitled to, and a generous assessment of the value of Defendant's services in the Industrial Commission proceeding.

¶ 32 Based on the whole record, clear, cogent, and convincing evidence supports the $250,000 restitution payment to McCollum and Brown.

## C. **Discrepancies between Written Order and Oral Findings**

¶ 33    Defendant contends that the written Order is at odds with the DHC's oral findings. This contention lacks merit.

¶ 34    After deliberations, the chair of the hearing panel announced the discipline the DHC was imposing on Defendant:

> The license of Patrick Megaro is suspended for a period of five years. He may reapply after three years with the following terms and conditions:
>
> Number one, that he pay the costs of this action;
>
> Number two, that he pay restitution in the amount of $250,000 with $125,000 going to the guardian ad litem for each of Mr. McCollum and Mr. Brown;
>
> Number three, that prior to being readmitted into practice that he complete ten hours of ethical -- ethics continuing legal education;
>
> Number four, that upon application to reinstate his license, that Mr. Megaro be supervised by an attorney that is approved by the State Bar, and that that supervision will take place for at least two years.
>
> That's the ruling of the panel.

¶ 35    There is no discrepancy between the chair's announcement and the written Order, which imposes a five-year suspension with conditions for reinstatement and permits Defendant to apply for a stay of the remainder of the suspension after three years if he satisfies the reinstatement conditions. The oral announcement of the DHC decision was not a comprehensive recitation of the 24-page Order because "[a] trial judge cannot be expected to enter in open court immediately after trial the detailed

findings of fact and conclusions of law that are generally required for a final judgment." *Morris v. Bailey*, 86 N.C. App. 378, 389, 358 S.E.2d 120, 127 (1987).

There is no merit to Defendant's argument that the additional level of detail in the DHC's written Order is a discrepancy.

## D. Equal Protection Argument

Defendant contends that the North Carolina State Bar violated his rights to Due Process and Equal Protection because "the Rules of Professional Conduct [we]re selectively enforced against [him]." This constitutional question was not raised in the lower tribunal and may not be raised for the first time in this Court. *See Lane v. Iowa Mut. Ins. Co.*, 258 N.C. 318, 322, 128 S.E.2d 398, 400 (1962) (citations omitted). Defendant's equal protection argument is not properly before the Court, and we decline to address it.

## III. Conclusion

The Order is affirmed.

AFFIRMED.

Judges DIETZ and CARPENTER concur.