IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-576

Filed 6 February 2024

Wilson County, No. 19-CVS-928

GLENN MOSELEY, Plaintiff,

v.

JOHNNY A. HENDRICKS, JR. and CITY OF WILSON, Defendants.

Appeal by plaintiff from orders entered 3 June 2021 and 7 December 2022 by Judge William D. Wolfe in Superior Court, Wilson County. Heard in the Court of Appeals 14 November 2023.

> *Narron & Holdford, P.A., by Ben L. Eagles, and Schmidt Law, PLLC, by Kurt Schmidt, for plaintiff-appellant.*
>
> *Brown, Crump, Vanore & Tierney, PLLC, by O. Craig Tierney, Jr. and Noelle K. Demeny, for defendant-appellee Johnny A. Hendricks, Jr.*
>
> *Cauley Pridgen, P.A., by James P. Cauley, III, Emily C. Cauley-Schulken, and Clayton H. Davis, for defendant-appellee City of Wilson.*

ARROWOOD, Judge.

Plaintiff-appellant ("plaintiff") appeals from orders entered by the trial court on 3 June 2021 and 7 December 2022. For the following reasons, we affirm the trial court's orders.

I.    Background

Around 10:30 a.m. on a weekend in December 2018, plaintiff, defendant-appellee Johnny A. Hendricks, Jr. ("Defendant Hendricks"), Taylor Keith ("Keith"),

Michael Taylor ("Taylor"), and Matt Ellis ("Ellis") started a game of golf at Wedgewood Municipal Golf Course. Plaintiff had previously played and watched golf and was familiar with its rules, etiquette, and dangers.

During the game, plaintiff consumed a substantial amount of moonshine and beer. Although each person in the group drank some of the moonshine that defendant Hendricks brought to the course, plaintiff admitted to drinking the most. Further, Keith, who shared a golf cart with plaintiff, estimated that plaintiff consumed an additional five to ten beers while playing. Taylor testified that plaintiff "by far had had the most alcohol that day" and was "heavily impaired." Near the end of the game, plaintiff testified to losing his balance and falling while trying to tee up his golf ball on the sixteenth hole in part due to his alcohol consumption. According to plaintiff, he had nothing to eat between the time he woke up that morning and the accident.

After the golf game concluded, Ellis departed, but the remaining four—defendant Hendricks, Keith, Taylor, and plaintiff—retrieved some range balls and headed to the course's driving range in their two golf carts. Defendant Hendricks and Taylor were in one cart with defendant driving while plaintiff and Keith were in the other cart with Keith driving. Defendant Hendricks and Keith drove the carts onto the asphalt parking lot located to the right of the driving range and parked them facing "towards the driving range[.]" Approximately sixty to seventy yards of fencing sat along the right side of the driving range between the range area and the parking lot. However, part of the asphalt parking lot extended beyond the fencing and thus

"is not covered by the fencing[.]"  The fencing consisted of a high-net fence and a low-screen fence.

According to defendant Hendricks, he parked his cart in the parking lot "right in front of the fence where if [he] had driven forward [he] would have hit the fence, and Keith parked the other cart "directly beside [his cart] on the asphalt."  However, unlike defendant Hendrick's cart, Keith testified that had his cart been driven forward from where it was parked, it would "have gone straight onto the driving range."

Taylor testified both carts were parked with the tires fully "on the asphalt" of the lot.[1]  Conversely, plaintiff did not "remember exactly where [Keith] parked" the cart but believed it was parked forward of the asphalt.  Keith also testified that he was unsure whether the front tires of the cart were on the asphalt or just forward of it but believed that at least "90% of the cart [was] over asphalt."  Although plaintiff testified that he would not have driven the cart forward past the fence line after it was parked by Keith, he also testified that the parking area was flat without "even the slightest bit of hill[.]"

While defendant Hendricks, Keith, and Taylor walked to the driving range's

---

[1] Taylor also testified that the cart plaintiff was sitting in remained in the same spot on the asphalt "from the time [he] was messing with [his] clubs to the time that [he] was fixing to walk onto the driving range."

tee-off area—situated approximately thirty yards from where they parked[2]—plaintiff remained seated in the cart.[3] At this point, plaintiff testified that he was not paying attention to his surroundings and was oblivious to the fact he was sitting next to the driving range and that the others had walked away from him "onto the driving range with clubs[.]" Taylor testified that while walking away, he recalled [plaintiff] still sitting in the cart, "twiddling with something."[4]

When defendant Hendricks, Keith, and Taylor reached the tee-off area, defendant Hendricks proceeded to hit first. Defendant Hendricks testified that before hitting the ball,

> [I] looked to make sure there's nobody in my target line, make sure I've got my target line. I check again just to make sure. . . . . There was no golf cart there. And then when I commit to the shot, addressed the ball, keep my head down like I've always been taught since high school golf, take the shot, and as I'm following through I hear the sound and see [plaintiff] where he was not there before.

According to defendant Hendricks, the ball did not go where he intended: "If I was hitting to – aiming at 12:00 o'clock on a dial, the ball went in between 1:00 and 2:00 o'clock." Defendant Hendricks further testified that he never saw the flight of the ball or the ball hitting plaintiff. Thus, according to defendant Hendricks, "There was no chance at all to yell fore. It was a split second."

---

[2] Because the fencing was approximately sixty to seventy yards in length, the tee-off area was thus positioned to the left of the middle area of the fence.

[3] Taylor recalled [plaintiff] saying he was going to sit in the cart while everyone else hit range balls.

[4] Plaintiff testified that he was texting his wife while sitting in the cart after it was parked.

Keith testified that he saw plaintiff "get struck in the eye" by the ball and that defendant Hendricks could have seen plaintiff "on a straight line" if defendant Hendricks had looked up "at the time he hit the ball[.]" However, Keith also testified that he "never saw a cart at the end of the fence line" when defendant Hendricks was preparing to hit the ball.

Although he never saw plaintiff get hit because he was looking in the opposite direction, Taylor testified that he heard the sounds of defendant Hendricks hitting the ball followed by the ball hitting plaintiff. Because of the short time between the two sounds, Taylor testified that there was not enough time for defendant Hendricks to yell, "Fore!" Plaintiff estimated that after Keith parked, he had been sitting in the cart for a few minutes before he was struck in the eye by the ball.

Plaintiff filed suit against defendant Hendricks on 17 June 2019, alleging that the ball strike caused injury and blindness to his left eye. Plaintiff filed an amended complaint on 6 January 2020 adding the City of Wilson as a defendant. On 14 May 2021, defendant Hendricks filed a motion for summary judgment. After the motion was heard, the trial court entered an order in favor of defendant Hendricks on 3 June 2021 based upon the finding that there was "no genuine issue as to any material fact and that [d]efendant Hendricks [was] entitled to [j]udgment as a matter of law on [p]laintiff's contributory negligence, the defense of [l]ast [c]lear [c]hance, and [p]laintiff's claim for [p]unitive [d]amages."

Defendant City of Wilson moved for summary judgment on 17 November 2022 on the basis that there were "no genuine issues as to any material fact . . . on the issues of immunity, negligence, and contributory negligence." The trial court entered an order in favor of the city on 7 December 2022. Plaintiff filed a notice of appeal from both orders on 16 December 2022.

## II. Discussion

On appeal, plaintiff contends the trial court erred in granting defendant Hendricks's motion for summary judgment on the issues of contributory negligence, last clear chance, and punitive damages. Plaintiff further contends the trial court erred in granting defendant City of Wilson's motion for summary judgment on the issues of sovereign immunity, negligence, and contributory negligence. We take each argument in turn.

## A. Standard of Review

"The standard of review for summary judgment is de novo." *Forbis v. Neal*, 361 N.C. 519, 524 (2007). "Summary judgment is appropriate when no genuine issue of material fact exists, and a party is entitled to judgment as a matter of law." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 267 (2023) (citations omitted). Further, under Rule 56(c) of the North Carolina Rules of Civil Procedure, such judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file . . . show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."

N.C.G.S. § 1A-1, Rule 56(c) (2023).

"A genuine issue is one that can be maintained by substantial evidence." *Value Health Sols., Inc.*, 385 N.C. at 267 (cleaned up). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (cleaned up).

### B.     Contributory Negligence

Plaintiff contends that the trial court erred in granting summary judgment for defendants as to the contributory negligence claim because genuine issues of material fact remain in the matter. We disagree.

"In order to prove contributory negligence on the part of a plaintiff, the defendant must demonstrate: (1) a want of due care on the part of the plaintiff; and (2) a proximate connection between the plaintiff's negligence and the injury." *Proffitt v. Gosnell*, 257 N.C. App. 148, 152 (2017) (cleaned up). Additionally, "the existence of contributory negligence does not depend on plaintiff's subjective appreciation of danger; rather, contributory negligence consists of conduct which fails to conform to an objective standard of behavior . . . ." *Smith v. Fiber Controls Corp.*, 300 N.C. 669, 673 (1980) (citation omitted).

Thus, "a person who possesses the capacity to understand and avoid a known danger and fails to take advantage of that opportunity, and is injured as a result, is chargeable with contributory negligence." *Proffitt*, 257 N.C. App. at 152–53 (cleaned

up). "[I]t is not necessary that plaintiff be actually aware of the unreasonable danger of injury to which his conduct exposes him. Plaintiff may be contributorily negligent if his conduct ignores unreasonable risks or dangers which would have been apparent to a prudent person exercising ordinary care for his own safety." *Smith*, 300 N.C. at 673 (citation omitted).

Here, plaintiff failed to exercise ordinary care for his safety, and there was a proximate connection between that failure and his injury. *See Proffitt*, 257 N.C. App. at 152. Although not an avid golfer, plaintiff testified that—having previously played and watched the sport—he was familiar with its rules and the dangers of being exposed to areas where balls are hit. Thus, when plaintiff became exposed to the flight of defendant Hendricks's ball in the driving range, his lack of situational awareness—due at least in part to his intoxication[5] and the distraction from his cell phone—constituted plaintiff's failure to exercise ordinary care. Although plaintiff testified that he was unaware he was even at the driving range—let alone in an exposed area—he would have known had he acted reasonably by maintaining awareness of his surroundings. *See Pierce v. Murnick*, 265 N.C. 707, 709 (1965) (explaining that a spectator, who was familiar with the sport of wrestling, "was contributorily negligent by sitting in an exposed position when he knew, or should

---

[5] Plaintiff's intoxication is evidenced by credible testimony—including his own—that (1) he consumed substantial amounts of moonshine and beer up until the latter part of the golf game and (2) was heavily impaired at the time of the accident.

have known, that a [wrestling] contestant might be thrown from the ring.").

Exactly how the golf cart plaintiff was sitting in became exposed to defendant Hendricks's ball is not a material issue. For instance, if the cart was initially parked in the exposed area past the fence line by Keith, a prudent person in plaintiff's position would have noticed such a precarious position and moved out of harm's way—especially given that plaintiff estimated he had been sitting there for a few minutes. Similarly, if the golf cart had rolled forward on its own or if plaintiff himself had inadvertently driven the cart into the exposed area, then plaintiff also failed to exercise reasonable care because a prudent person in such position would have recognized the moving cart and either stopped it before it was exposed or moved out of the way after the fact. Accordingly, the trial court did not err in granting defendants' motions for summary judgment as to contributory negligence.

### C.    Last Clear Chance

The last clear chance doctrine requires the plaintiff

> show the following essential elements: (1) the plaintiff, by his own negligence put himself into a position of helpless peril; (2) defendant discovered, or should have discovered, the position of the plaintiff; (3) defendant had the time and ability to avoid the injury; (4) defendant negligently failed to do so; and (5) plaintiff was injured as a result of the defendant's failure to avoid the injury.

*Trantham v. Est. of Sorrells By & Through Sorrells*, 121 N.C. App. 611, 613 (1996) (cleaned up). Additionally, "[t]he doctrine contemplates a last 'clear' chance, not a last 'possible' chance, to avoid the injury; it must have been such as would have

enabled a reasonably prudent man in like position to have acted effectively." *Culler v. Hamlett*, 148 N.C. App. 372, 379 (2002) (citations omitted).

Here, plaintiff's contention fails because defendant Hendricks did not discover, nor should he have discovered, plaintiff's position until after he had already hit the ball. Specifically, if the cart had moved forward onto the driving range while defendant Hendricks was looking down and addressing his ball, defendant Hendricks would not have known of plaintiff's precarious position until after he hit the ball. This is evidenced by testimony from defendant Hendricks, Taylor, and Brady Pinner—the golf course supervisor and professional at the Wedgewood Golf Course— that it is standard practice for golfers not to look up again after they have started to address the ball.

Defendant Hendricks testified that, before putting his head down and addressing the ball, he checked in front of him twice and saw no golf cart. Similarly, Keith testified that he saw "a portion of the cart" when defendant Hendricks hit the ball but "never saw a cart" while defendant Hendricks was preparing to hit the ball. Although Keith testified that defendant Hendricks could have seen plaintiff had he looked up "at the time he hit the ball," such testimony differs from saying defendant Hendricks could have seen plaintiff had he looked up during his preparation period before hitting the ball. Thus, a reasonably prudent golfer in defendant Hendrick's position could not have acted effectively to avoid injury. *See Culler*, 148 N.C. App. at 379 ("The doctrine contemplates a last 'clear' chance, not a last 'possible' chance, to

avoid the injury[.]").

Plaintiff's reliance on *Everett v. Goodwin*, 201 N.C. 734 (1931) is also unavailing. In *Everett,* the defendant was in a group that was playing behind the plaintiff on the same hole. Thus, unlike in this case, the plaintiff was clearly visible to the defendant as he was—and had been—playing right in front of him. *Id.*

Golfers in North Carolina indeed have a duty to "give adequate and timely notice to persons who appear to be unaware of their intentions to hit the ball when they know, or should know, that such persons are so close to the intended flight of the ball that danger to them may be reasonably anticipated." *McWilliams v. Parham*, 273 N.C. 592, 597 (1968) (cleaned up). However, they are not "insurer[s] of such persons, nor does such duty arise for the benefit of persons situate[d] in a place where danger from the driven ball might not be reasonably anticipated." *Id.*

### D. Punitive Damages

Plaintiff contends that the trial court erred in granting summary judgment on the issue of punitive damages. We disagree. To recover punitive damages in North Carolina, "a claimant must prove that an aggravating factor of fraud, malice, or willful or wanton conduct is present and related to the injury subject to compensatory damages." *Jones v. J. Kim Hatcher Ins. Agencies Inc.*, 893 S.E.2d 1, 14 (N.C. Ct. App. 2023) (citing N.C.G.S. § 1D-15(a)). As discussed above, none of defendant Hendricks's actions rose to this level.

### E. Claims Against Defendant City of Wilson

Plaintiff also contends the trial court erred in granting defendant City of Wilson's motion for summary judgment on the issues of sovereign immunity and negligence. However, even assuming arguendo that governmental immunity is not available to defendant City of Wilson as a defense, neither issue needs to be addressed because there was no genuine dispute of material fact as to plaintiff's contributory negligence as detailed in the analysis for his claim against defendant Hendricks. Plaintiff's negligence claim is thus barred by his own contributory negligence.

## III.    Conclusion

For the foregoing reasons, the trial court's judgment is affirmed.

AFFIRMED.

Judge WOOD concurs.

Judge THOMPSON dissents by separate opinion.

THOMPSON, Judge, dissenting.

After careful consideration of the matters discussed below, I conclude that there remain genuine issues of material fact regarding the claims against both defendants in this case which render summary judgment inappropriate. I therefore respectfully dissent.

First, I agree with plaintiff that the trial court's allowance of summary judgment in favor of defendants based on the doctrine of contributory negligence was inappropriate because genuine issues of material fact remain, particularly concerning how the golf cart in which plaintiff was seated at the time he was struck by the golf ball came to be on the driving range.

A defendant can establish that the plaintiff was contributorily negligent by showing: "(1) a want of due care on the part of the plaintiff; and (2) a proximate connection between the plaintiff's negligence and the injury." *Daisy v. Yost*, 250 N.C. App. 530, 531, 794 S.E.2d 364, 366 (2016) (citation, internal quotation marks, and brackets omitted). Further, "a plaintiff may relieve the defendant of the burden of showing contributory negligence when it appears from the plaintiff's own evidence that he was contributorily negligent." *Proffitt v. Gosnell*, 257 N.C. App. 148, 152, 809 S.E.2d 200, 204 (2017) (citation, internal quotation marks, and brackets omitted).

> "Summary judgment is rarely an appropriate remedy in cases of negligence or contributory negligence. However, summary judgment is appropriate in a cause of action for negligence where 'the forecast of evidence fails to show negligence on defendant's part, or establishes plaintiff's

> contributory negligence as a matter of law.' " *Frankenmuth Ins. v. City of Hickory*, 235 N.C. App. 31, 34, 760 S.E.2d 98, 101 (2014) (quoting *Stansfield v. Mahowsky*, 46 N.C. App. 829, 830, 266 S.E.2d 28, 29 (1980)). " 'A plaintiff is required to offer legal evidence tending to establish beyond mere speculation or conjecture every essential element of negligence, and upon failure to do so, summary judgment is proper.' " *Id.* (quoting *Young v. Fun Services-Carolina, Inc.*, 122 N.C. App. 157, 162, 468 S.E.2d 260, 263 (1996)).

*Blackmon v. Tri-Arc Food Systems, Inc.*, 246 N.C. App. 38, 42, 782 S.E.2d 741, 744 (2016) (brackets omitted). Accordingly, the dispositive question on this argument by defendants is whether evidence from either or both sides in the conflict demonstrates that plaintiff was negligent as a matter of law as to the proximate cause of the injury which occurred when he was seated in a golf cart on the driving range at Wedgewood. My review of the depositions of the witnesses to this incident which appear in the record reveals that genuine issues of material fact remain.

Taylor, who rode in the golf cart with Hendricks on the day in question, testified that the two golf carts were parked fully on the asphalt of the parking lot, with Taylor's and Hendricks's cart facing the fence separating the driving range from the lot and Keith's and plaintiff's cart just past the end of the fencing facing directly onto the driving range. Taylor noted that as he, Hendricks, and Keith walked to the driving range tees, plaintiff was seated in the golf cart, "on his phone . . . [or] twiddling with something." Taylor stated that the threesome intending to drive balls walked past the fence line and onto the edge of the driving range to make their way to the range tees, which Taylor felt was safe because no one was hitting on the driving

2

range. Taylor never saw plaintiff or his golf cart moving or heard any sound from plaintiff or the golf cart in which he was seated up until defendant's drive struck plaintiff. When the ball struck plaintiff, however, Taylor agreed that the golf cart in which plaintiff was seated had "moved" and was then located on the driving range itself.

Keith testified that when the four players parked their two golf carts in or near the parking lot, the cart driven by Hendricks was behind the fencing, while the cart driven by Keith was just past the end of the fence line so that it could have been driven directly onto the driving range. He thought the cart was mainly parked on the parking lot but agreed that the front wheels could have been on the grass. However, he could not recall with certainty the exact location of the golf cart. Keith also stated that "[m]ost of the time" he would engage the brake when stopping a golf cart, but he was not asked and did not state whether he did so in this specific instance. In this circumstance, he did not see the cart, which he had been driving with plaintiff as a passenger, move after he parked it, took out a club for use on the driving range and walked in that direction. He never saw any golf cart or plaintiff on the driving range.

Defendant testified that plaintiff did not want to hit balls on the driving range and remained in the golf cart on the asphalt of the parking lot. Hendricks further stated that he looked down the driving range once he teed up his first shot and did not see plaintiff or any other obstruction on the range before focusing downward on the ball he was about to hit, but then after hitting the ball, Hendricks saw defendant

3

"sitting in" the golf cart that was "not [there] before." He emphasized that the golf cart in which plaintiff was seated was not on the driving range when he last saw it, but that he never saw the cart move onto the driving range.

Plaintiff testified that he did not recall many details after he fell over, and he specifically did not have clear memories of some members of the group deciding to hit balls on the driving range and explained that he thought the carts might have been parked in the parking lot area because the group was going to load their golf clubs into their vehicles. Although he did not recall much before he was struck by the golf ball, he stated that he had been texting his wife and then, once he was struck, he looked down and saw blood on the gravel, which he believed to be in an area between the asphalt of the parking lot and the grass of the driving range. Plaintiff acknowledged that the golf cart was "more forward" than it had been when Keith parked it, but plaintiff did not recall how any movement occurred. He did emphatically state that he did not move the golf cart himself and, in any event, would not have driven the cart onto the driving range himself because that would be "dangerous."

Brady Pinner, who described his titles as golf course supervisor, golf director, and golf professional at Wedgewood, testified that when he was alerted to the accident, he went to the driving range but could not recall whether a golf cart was located on the range or not. He acknowledged an email incident report from himself which referenced the golf cart in which plaintiff was seated being on the range, but

4

he explained that he did not know whether that report stated his own observation or incorporated the information he received from others in connection to the accident. In any event, Pinner was not present at the time of the accident and thus had no knowledge of how plaintiff came to be on the driving range.

As these excerpts of the deposition testimony show, there are disputes about both the location of the golf cart at the time when plaintiff was struck and about how the golf cart came to be in that location. Plaintiff recalls seeing blood from his injury on gravel (an area between the parking lot and the driving range). Other parties testified that the cart plaintiff was seated in when struck was partially or fully in the driving range itself. If indeed the golf cart in which plaintiff was seated when he was struck and injured was on the driving range, no witness or party testified to how the golf cart came to be in that location.

Defendant acknowledges this uncertainty but contends:

> There are only two versions of how [p]laintiff ended up on the driving range. Whether the cart was originally parked past the fence line on the driving range; or behind the fence line on asphalt (and then moved), [p]laintiff failed to take reasonable care to notice his surroundings. If he moved the cart onto the range himself, he was negligent in not using ordinary care under [sic] for his own safety. If the cart was parked on the driving range to begin with, then [p]laintiff was negligent by looking down and texting, not being aware of his circumstances and failing to move himself or the cart back behind the fence line.

I disagree. As noted above, the parties and witnesses in this case disagree about where the golf cart was initially parked when plaintiff was left behind by the

members of the group who went to see who could hit the longest drive. Further, wherever the golf cart was initially parked by Keith, *if* the cart came to be located on the driving range when plaintiff was struck, there is no evidence regarding how and when it came to be in that location; for example, whether it was moved by plaintiff, rolled or lurched forward without action by plaintiff, or was moved by some party other than plaintiff. Defendant himself testified that when he glanced up at the range before briefly looking down at the ball, he did not see plaintiff. This suggests that the cart could have moved into a dangerous location too quickly for plaintiff to react by looking up. I express no opinion on these possibilities, and I believe that the majority's various suggestions of how plaintiff could have had the time and ability to act to protect himself usurp the role of the factfinder in the trial court. Such "mere speculation or conjecture" is insufficient to sustain summary judgment, *Blackmon*, 246 N.C. App. at 42, 782 S.E.2d at 744 (citation and internal quotation marks omitted), and in any event, the questions of fact regarding exactly where the golf cart was located at the time of the injury and how it came to be there are not for this Court but rather are left to the thoughtful consideration of a factfinder in the trial court, whether a jury or the trial court.

I also find persuasive plaintiff's argument that governmental immunity is not available as a complete defense to the City on plaintiff's claims that the City was negligent in regard to the fencing not extending fully between the driving range and

the adjacent parking area, the location of the tees on the driving range, and in overserving alcohol to the golf group here.

"Under the doctrine of governmental immunity, a county or municipal corporation is immune from suit for the negligence of its employees in the exercise of governmental functions absent waiver of immunity." *Estate of Williams v. Pasquotank County Parks & Rec. Dep't*, 366 N.C. 195, 198, 732 S.E.2d 137, 140 (2012) (citations and internal quotation marks omitted).[6] "Governmental immunity covers *only* the acts of a municipality or a municipal corporation committed pursuant to its governmental functions . . . . [but] does not, however, apply when the municipality engages in a proprietary function." *Id.* at 199, 732 S.E.2d at 141 (emphasis in original) (citations, internal quotation marks, and brackets omitted).

> [A] governmental function is an activity that is discretionary, political, legislative, or public in nature and performed for the public good [o]n behalf of the State rather than for itself[, while a] proprietary function, on the other hand, is one that is commercial or chiefly for the private advantage of the compact community.

*Id.* (citations and quotation marks omitted). In undertaking this sometimes difficult task of distinguishing the two functions, the North Carolina Supreme Court has noted as "the threshold inquiry . . . whether our legislature has designated the particular function at issue as governmental or proprietary." *Id.* at 199–200, 732

---

[6] Waiver is not an issue in this case.

S.E.2d at 141 (citations and internal quotation marks omitted). Our legislature has

provided:

> The lack of adequate recreational programs and facilities
> is a menace to the morals, happiness, and welfare of the
> people of this State. Making available recreational
> opportunities for citizens of all ages is a subject of general
> interest and concern, and a function requiring appropriate
> action by both State and local government. The General
> Assembly therefore declares that the public good and the
> general welfare of the citizens of this State require
> *adequate recreation programs, that the creation,*
> *establishment, and operation of parks and recreation*
> *programs is a proper governmental function*, and that it is
> the policy of North Carolina to forever encourage, foster,
> and provide these facilities and programs for all its
> citizens.

N.C. Gen. Stat. § 160A-351 (2021) (emphasis added).

Still, the Supreme Court has

> recognize[d] that not every nuanced action that could occur
> in a park or other recreational facility has been designated
> as governmental or proprietary in nature by the
> legislature. We therefore offer the following guiding
> principles going forward. When the legislature has not
> directly resolved whether a specific activity is
> governmental or proprietary in nature, other factors are
> relevant. We have repeatedly held that if the undertaking
> is one in which only a governmental agency could engage,
> it is perforce governmental in nature. This principle
> remains true. So, when an activity has not been designated
> as governmental or proprietary by the legislature, that
> activity is necessarily governmental in nature when it can
> only be provided by a governmental agency or
> instrumentality.
>
> We concede that this principle has limitations in our
> changing world. Since we first declared in *Britt*, over half a

8

century ago, that an activity is governmental in nature if it can only be provided by a governmental agency, many services once thought to be the sole purview of the public sector have been privatized in full or in part. Consequently, it is increasingly difficult to identify services that can only be rendered by a governmental entity.

> *Given this reality, when the particular service can be performed both privately and publicly, the inquiry involves consideration of a number of additional factors, of which no single factor is dispositive. Relevant to this inquiry is whether the service is traditionally a service provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider.* We conclude that consideration of these factors provides the guidance needed to identify the distinction between a governmental and proprietary activity. *Nevertheless, we note that the distinctions between proprietary and governmental functions are fluid and courts must be advertent to changes in practice.* We therefore caution against overreliance on these four factors.

*Estate of Williams*, 366 N.C. at 202, 732 S.E.2d at 142–43 (emphasis added) (citations and quotation marks omitted).

Thus, while municipal parks and recreation programs are generally held to be governmental services, the specific circumstances of the particular "parks and rec" activity must be considered in light of the claims advanced by a plaintiff in a "fluid" manner that reflects considerations that are "advertent" to changes in practice. *See id.* The acts or omissions by the City here which plaintiff alleges to have been negligent—in the placement of the fencing between the driving range and the parking lot area, in the location of the driving range tees on the day in question, and in the

9

serving of alcohol to members of the golf group here—do not appear to have conclusively been held to be governmental functions. The record before this Court, on summary judgment, is not fully developed and no party has cited controlling case law where the specific issues of the fencing and placement of tees on a driving range or the sale and potential overserving of alcohol at a parks and recreation facility are addressed.

Moreover, as noted above, the question of contributory negligence by plaintiff remains undecided, and specifically in connection to claims against the City, deposition testimony suggested that the tee area on the driving range was set about 30–35 yards down the driving range with the fence line extending about 60–70 yards in total, such that the driving range tees were set about halfway down the fence line. Pinner also acknowledged that on the date of the incident, the golf group of five men came into the clubhouse at the eleventh hole and purchased eighteen beers. He further noted "hearing" that some people had previously had their cars hit by golf balls from the driving range, although no formal reports had been filed. All of these issues are for the factfinders at trial.

Genuine issues of material fact remain in this case and accordingly, I would reverse the trial court's orders allowing summary judgment in favor of the defendants and remand for further proceedings in the trial court. For this reason, I dissent.